UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2023 AUG 17  PM 4:48

CLERK

BY _____
DEPUTY CLERK

AARON BRUSH,                    )
                               )
        Plaintiff,             )
                               )
        v.                     )        Case No. 2:21-cv-00155
                               )
OLD NAVY LLC, SCOTT GRAHAM,    )
TIMOTHY OLIVER, and            )
TOWN OF WILLISTON,             )
                               )
        Defendants.            )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT OLD NAVY'S MOTION TO EXCLUDE PLAINTIFF'S EXPERT
THOMAS POWELL AND GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**
(Docs. 122, 123, 124, 125, 126)

Plaintiff Aaron Brush ("Plaintiff") brings this case against Defendants Old Navy,

LLC ("Old Navy"), Scott Graham ("Defendant Graham"), Timothy Oliver ("Defendant

Oliver"), and the Town of Williston (the "Town") (collectively, "Defendants"), alleging

that Defendants unlawfully discriminated against him because of his Tourette's

syndrome, falsely imprisoned him, and violated his Fourth Amendment right to be free

from unreasonable search and seizure.

Pending before the court are Old Navy's motion to exclude Plaintiff's expert

witness Thomas Powell, PhD ("Dr. Powell") (Doc. 125) and Defendants' individual

motions for summary judgment. (Docs. 122, 123, 124, 126.) The court held a hearing on

all pending motions on December 6, 2022, at which time it took the motions under

advisement.

Plaintiff is represented by David E. Bond, Esq. Old Navy is represented by John

D. Prendergast, Esq., Laura C. Bunting, Esq., and Samuel H. Martin, Esq. Defendant

Graham is represented by Kevin L. Kite, Esq. Defendant Oliver is represented by

Michael J. Leddy, Esq. The Town is represented by Marikate E. Kelley, Esq. and Philip C. Woodward, Esq.

## I.      Procedural Background.

On May 5, 2021, Plaintiff filed a Complaint in Vermont Superior Court, Addison Unit, alleging four causes of action: a claim for disability discrimination in violation of 9 V.S.A. § 4501 against Old Navy (Count I); a claim for false imprisonment against Old Navy and Defendants Graham and Oliver (Count II); a 42 U.S.C. § 1983 claim for unreasonable search and seizure in violation of the Fourth Amendment against Defendants Graham and Oliver (Count III); and a 42 U.S.C. § 1983 claim for failure to properly train and supervise Defendants Graham and Oliver against the Town (Count IV).[1] On June 10, 2021, Defendants removed the case to this court.

On September 9, 2022, Defendants individually moved for summary judgment on all claims against them. (Docs. 122, 123, 124, 126.) On October 11, 2022, Plaintiff responded to the motions filed by Defendants Graham, Oliver, and the Town. (Docs. 137, 138, 139.) Defendant Graham replied on October 24, 2022 (Doc. 148), and Defendant Oliver and the Town replied on October 25, 2022. (Docs. 150, 151.) Plaintiff responded to Old Navy's motion for summary judgment on October 18, 2022 (Doc. 143), and Old Navy replied on November 8, 2022. (Doc. 153.)

Also on September 9, 2022, Old Navy filed a motion to exclude Dr. Powell. (Doc. 125.) Plaintiff responded on September 22, 2022 (Doc. 130), and Old Navy replied on October 6, 2022. (Doc. 134.)

## II.     Defendant Old Navy's Motion to Exclude Plaintiff's Expert Witness Dr. Thomas Powell.

### A.      Dr. Powell's Opinions.

Plaintiff seeks to introduce the expert opinion of Dr. Powell in support of Plaintiff's claim that his experience at Old Navy caused and will cause him past and future psychological harm, including post-traumatic stress disorder ("PTSD"). Old Navy

---

[1] In the Complaint, both the third and fourth counts are identified as Count III.

asks the court to exclude Dr. Powell's PTSD diagnosis as unreliable, although it does not challenge Dr. Powell's qualifications as an expert witness.

Dr. Powell is a forensic psychologist who has a PhD in clinical psychology and is licensed as a psychologist-doctorate by the State of Vermont. Since 2004, he has conducted psychological evaluations and risk appraisals for individuals referred to him by attorneys, courts, employers, and others. He has also provided expert witness testimony in state and federal courts, consulted in civil and criminal litigation, and trained clinicians, probation officers, and others.

Dr. Powell supervised doctoral students in clinical psychology as an adjunct psychology professor at the University of Vermont from 2011 to 2021 and at Antioch University of New England from 2014 to 2021. From 1986 to 2004, he was the Director of Clinical Programs for the Vermont Department of Corrections. Since 1984, Dr. Powell has published and given presentations on various topics in psychology and criminal justice.

Dr. Powell interviewed Plaintiff on October 5 and October 19, 2021. During those interviews, he administered four psychometric tests. He bases his opinions on his clinical evaluation, as well as on Plaintiff's neurological and mental health records from various providers from 2011 to 2021 and on interviews with Plaintiff's mother, romantic partner, program manager, and probation officer. He opines:

> As a result of the actions of Williston police and Old Navy employees on 11/28/19, [Plaintiff] suffers from exacerbated traumatic psychological symptoms that have negatively affected his life during the past two years. These include, but are not limited to, anger, agitation, avoidance, relationship stress, loss of sexual interest, self-doubt, cessation of music performances, and related symptoms of his disorders. He demonstrates psychological symptoms consistent with diagnoses of complex post-traumatic stress disorder, depression and obsessive[-]compulsive disorder. The actions of police and store employees on 11/28/19 substantially worsened his pre-existing clinical conditions.

(Doc. 130-3 at 3.)

Explaining that "[t]he Clinician-Administered PTSD Scale for [the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5")] (CAPS-5) is a

comprehensive assessment of the various criteria described in DSM-5 that form the basis for post-traumatic stress disorder[,]" *id.* at 8, Dr. Powell further opines:

> Based on [Plaintiff's] responses [to the CAPS-5 test] (which aligned with other data sources and were deemed valid), [Plaintiff] meets criteria for PTSD related to his experiences at Old Navy on 11/28/19. The level of severity is particularly evident in symptoms related to his persistent negative mood, distorted cognitions, intrusive memories, and cued psychological distress.

*Id.* at 8-9. He concludes that Plaintiff's experience at Old Navy "caused significant, enduring psychological harm[,]" *id.* at 9, necessitating "specialized trauma therapy [which] is likely to cost $250 per hour, and extend for three to five years, costing in the range of $36,000 to $60,000." *Id.* at 10.

With regard to causation, Dr. Powell testified in deposition as follows:

> A. . . . I would say that [Plaintiff] carries multiple diagnoses including depression, generalized anxiety, Tourette's syndrome, OCD and substance dependency. I think all of them were impacted in one degree or another by what happened at Old Navy. To cherry-pick one out is probably overstating the particular importance of one versus another because they all are important. They all have an impact on your life, and we've spent a good deal of time talking about the PTSD one but we -- the depression and the generalized anxiety and the other issues that he's got are, are very important as well. So, I would just -- I would say that all, all the diagnoses were impacted by Old Navy.
>
> Q. And, presumably, you mean impacted in a negative fashion?
>
> A. True.

(Doc. 125-2 at 17.)

With regard to the PTSD diagnosis, Dr. Powell explained that he took "a somewhat expansive interpretation of Criteri[on] A" of the DSM-5 that he believed to be "consistent with the type of nonlethal, nonsexual, nonmilitary experience that we see in other folks who have been recently diagnosed with PTSD such as the, the 911 responders, people who have been exposed to something that is sufficiently overwhelming, that you are feeling helpless and in that moment overwhelmed." *Id.* at 56. He expected that "the trauma that will be described as a part of PTSD in DSM-6 is going to be expanded well beyond what it is now[.]" *Id.* at 9.

4

## B.    Standard of Review.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 obligates the court to serve as a gatekeeper for expert testimony, ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

As a threshold matter, Dr. Powell's knowledge, education, and experience qualify him to offer an expert witness opinion regarding Plaintiff's psychological state as a result of the incident. *See United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) ("To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."). Old Navy does not contest his opinions on this basis. Instead, it asserts that Dr. Powell's PTSD diagnosis is not reliable under Rule 702 and *Daubert* because Plaintiff has "*never* been diagnosed with PTSD by any of his treating therapists"; "he does not meet the accepted criteria for PTSD as set forth in" the DSM-5; and "Dr. Powell fails to account for alternative causes of which there are many, including a recent car accident" caused by Plaintiff. (Doc. 125 at 2.)

"In deciding whether . . . an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos, v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). An expert's testimony must not be conclusory or speculative and must be grounded in reliable evidence. *See Major League Baseball Props., Inc. v.*

5

*Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) ("At trial, proffered expert testimony should be excluded if it is speculative or conjectural; the [a]dmission of expert testimony based on speculative assumptions is an abuse of discretion[.]") (internal quotation marks and citations omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### C.    Whether Dr. Powell's PTSD Diagnosis is Admissible Under Rule 702.

As it is unclear whether Plaintiff's treating therapists were qualified to provide Plaintiff with a psychiatric diagnosis such as PTSD, the lack of PTSD diagnosis from them does not necessarily undermine the reliability of Dr. Powell's opinions. The same cannot be said, however, for Dr. Powell's departure from the DSM-5 criteria for PTSD in reaching his PTSD diagnosis.

The DSM-5 criteria for PTSD require "[e]xposure to actual or threatened death, serious injury, or sexual violence" ("Criterion A") and the "[p]resence of one (or more) of [certain] symptoms associated with the traumatic event(s), beginning after the traumatic event(s) occurred[.]" (Doc. 125-1 at 2.) Although Dr. Powell opines that Plaintiff was experiencing PTSD based on his CAPS-5 test results and the specific symptoms that informed the test results, he fails to address whether or how Plaintiff experienced any "[e]xposure to actual or threatened death, serious injury, or sexual violence" during his experience at Old Navy. *Id.* Dr. Powell acknowledged that Plaintiff's presence in the Old Navy store and interactions with Old Navy employees would not, in and of themselves, constitute a traumatic experience for the purposes of a PTSD diagnosis. He also acknowledged that Plaintiff was not subject to physical force or the threat of physical force and that he did not "observe any dead bodies[.]" (Doc. 125-2 at 56-57.) Dr. Powell explained that his "somewhat expansive interpretation" of the DSM-5 Criterion A is based on an emerging understanding within the psychology field of the trauma underlying PTSD, which he expects to be reflected in the next edition of the DSM. *Id.* at 56. He recognizes that "[t]here are substantial professional disagreements about how you go about including or not including a diagnosis or changing a diagnosis in

the DSM." *Id.* at 11.

Speculation about the standard for PTSD in future editions of the DSM is not reliable and does not reflect "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005) (citations and footnote omitted). This is particularly true where an expert bases this speculation on "emerging literature" authored in 2009 and 2016. (Doc. 125-2 at 9.)[2] Since that time, the view of these arguably dated articles has apparently not been endorsed by mental health professionals. The court is therefore not convinced that Dr. Powell's PTSD opinion has gained acceptance in the scientific community. *See also Daubert*, 509 U.S. at 594 ("Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support within the community may properly be viewed with skepticism.") (internal citation and quotation marks omitted).

The court also has a concern about the reliability of Dr. Powell's PTSD causation opinion. "[E]ven though an expert need not rule out every potential cause in order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." *Davids v. Novartis Pharms. Corp.*, 857 F. Supp. 2d 267, 278 (E.D.N.Y. 2012) (internal quotation marks omitted); *see also MacSwan v. Merck & Co.*, 2023 WL 3990673, at *6 (W.D.N.Y. June 14, 2023) ("Dr. Morhaim's failure to . . . exclude other potential causes of [p]laintiff's dental conditions undermines the reliability of his opinions.").

Dr. Powell admitted that he instructed Plaintiff to focus on the Old Navy incident during his interviews. This, in turn, appears to have resulted in a failure to rule out other causes, including a car accident Plaintiff caused in which another person almost died; the lengthy illness and subsequent death of Plaintiff's father, followed by the death of an

---

[2] *See also* Holmes et al., *Expanding Criterion A for Posttraumatic Stress Disorder: Considering the Deleterious Impact of Oppression*, 22(4) TRAUMATOLOGY 314 (2016); Brewin et al., *Reformulating PTSD for DSM-V: Life After Criterion A*, 22(5) J. TRAUMATIC STRESS 366 (2009).

uncle who served as a father figure for him (Doc. 134 at 7); and a motorbike accident resulting in his hospitalization, facial injuries, and the loss of Plaintiff's ability to sing. Dr. Powell neither addresses these "obvious alternative causes[,]" nor "provide[s] a reasonable explanation for dismissing" them. *Davids*, 857 F. Supp. 2d at 278.[3]

The fact that Dr. Powell made his PTSD diagnosis solely for purposes of this litigation further weighs against its reliability. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (expressing a preference for opinions derived not solely for litigation purposes because "an expert [who] testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science"); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 430 (S.D.N.Y. 2016) ("Expert testimony developed solely for litigation can weigh against reliability."); *see also Grajeda v. Vail Resorts Inc.*, 2023 WL 4803755, at *13 (D. Vt. July 27, 2023) ("The fact that Dr. Scher's opinions were derived solely for purposes of litigation undercuts their reliability."). Although all of Dr. Powell's opinions regarding Plaintiff's conditions fail to rule out alternative causes, with regard to Plaintiff's other mental health conditions, Dr. Powell's opinion is that the Old Navy incident exacerbated Plaintiff's existing well-documented conditions. With regard to his PTSD diagnosis, however, Dr. Powell's opinion is that the Old Navy incident is the

---

[3] *See also MacSwan v. Merck & Co.*, 2023 WL 3990673, at *6 (W.D.N.Y. June 14, 2023) (finding expert doctor's causation opinion was unreliable where his report "fail[ed] to rule out these alternative causes of [p]laintiff's alleged [disease]"); *Tardif v. City of New York*, 344 F. Supp. 3d 579, 601 (S.D.N.Y. 2018) ("The Committee Notes to Rule 702 explain that '[w]hether the expert has adequately accounted for obvious alternative explanations' for a plaintiff's condition is a factor in the reliability inquiry.") (quoting Fed. R. Evid. 702 advisory committee notes to 2000 amendments) (alteration in original); *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 262 (S.D.N.Y. 2018), *aff'd sub nom. In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113 (2d Cir. 2020) (collecting cases and observing that "[f]or an expert's testimony to be reliable, she must demonstrate that she has adequately accounted for obvious alternative explanations") (alteration adopted) (internal quotation marks omitted); *Israel v. Spring Indus., Inc.*, 2006 WL 3196956, at *4-5 (E.D.N.Y. Nov. 3, 2006) (observing "gaps" in an expert's analysis caused by his failure to review the plaintiff's complete medical records or to conduct a differential analysis to exclude "other alternative possible causes") (internal quotation marks omitted).

causal traumatic event. This renders the failure to rule out other causes problematic. For the reasons stated above, because it lacks sufficient scientific rigor, Dr. Powell's PTSD diagnosis is inadmissible under Rule 702.

Even if it were admissible under Rule 702, Dr. Powell's expert testimony poses a significant risk of confusing the jury regarding the standards for a PTSD diagnosis. A lay juror may not understand that experts generally do not create their own criteria for a particular diagnosis. Because the term "PTSD" is used in common parlance, jurors may not realize there are actually well-recognized criteria and expected symptoms and causal mechanisms for this diagnosis which may not be found in many instances in which the term is used by laypersons.

Because the probative value of Dr. Powell's PTSD diagnosis is substantially outweighed by the potential for juror confusion, Dr. Powell's PTSD opinion is inadmissible under Rule 403. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

Dr. Powell remains qualified, however, to opine that, based on his interviews with Plaintiff and people associated with him, and based on his testing, training, education, and experience, Plaintiff suffered psychological stress and symptoms as a result of the Old Navy incident. He may also opine that Plaintiff is more likely than not to continue to experience those symptoms in the future. Dr. Powell may also opine as to the expected course of treatment and approximate cost but, in doing so, cannot ignore his own opinion that Plaintiff presented with "pre-existing clinical conditions." (Doc. 130-3 at 3.)

For these reasons, although Dr. Powell's opinion that Plaintiff suffers from PTSD does not satisfy Rule 702 or Rule 403 and is inadmissible as expert testimony, the remaining aspects of his opinion are well within Rule 702 and admissible under Rule 403 as well. Any deficiencies in those opinions may be adequately addressed through rigorous cross-examination. Old Navy's motion to exclude Dr. Powell is therefore GRANTED IN PART and DENIED IN PART.

III.    **Defendants' Motions for Summary Judgment.**

   A.    **Standard of Review.**

The court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). The court "constru[es] the evidence in the light most favorable to the non-moving party" and "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (internal quotation marks omitted). There is no genuine dispute where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). "Once the moving party demonstrates that there are no genuine issues of material fact, the nonmoving party must come forth with evidence sufficient to allow a reasonable jury to find in its favor." *Spinelli v. City of New York*, 579 F.3d 160, 166 (2d Cir. 2009) (alteration adopted) (internal quotation marks omitted). "Thus, a nonmoving party can defeat a summary judgment motion only by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in its favor, to establish the existence of an element at trial." *Id.* at 166-67 (alterations adopted) (internal quotation marks omitted).

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (citation omitted).

"A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita*, 475 U.S. at 586). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). However, if the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Id.* at 251-52. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Kaytor*, 609 F.3d at 545 (internal quotation marks and emphasis omitted).

### B. The Factual Record on Summary Judgment.

In this case, Defendants Graham, Oliver, and the Town have identified 283 paragraphs of facts which they contend are undisputed regarding an incident that lasted no more than a couple of hours. Although Plaintiff agrees that many of Defendants' facts are undisputed, with regard to the remainder, Plaintiff either disputes the fact with a proper citation to evidence; asks that an undisputed fact be disregarded because it states a conclusion of law or is not relevant; or agrees that certain facts exist or that a particular statement was made, but asserts that this fact or statement cannot be considered in isolation and instead must be considered with other facts which Plaintiff at times supplies.

In addition to lengthy statements of the operative facts, Plaintiff and Defendants Graham, Oliver, and the Town have submitted more than 2,000 pages of documents in support of their motions and oppositions. This is neither a helpful nor efficient briefing style. *See Allen v. Dairy Farmers of Am., Inc.*, 2014 WL 2610613, at *2-3 (D. Vt. June 11, 2014) (observing that the parties' submission of hundreds of paragraphs of facts and

lengthy responses demonstrated an "absence of any discernible effort by the parties to narrow the factual or legal issues before the court"); *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.,* 879 F.2d 1005, 1011 (2d Cir. 1989) ("A vast array of factual contentions have been advanced by the parties. In considering a motion for summary judgment, however, the substantive law will identify which facts are material.") (internal quotation marks omitted); *Bordelon v. Chi. Sch. Reform Bd. of Trs.,* 233 F.3d 524, 528-29 (7th Cir. 2000) (concluding that a trial court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact"). In light of the voluminous factual record before the court, the court will not set forth all of the undisputed or disputed facts but will instead focus only on those that are material.

### C.     The Undisputed Facts.

Plaintiff is a thirty-five-year-old resident of Middlebury, Vermont who has, among other conditions, Tourette's syndrome ("Tourette's") and obsessive-compulsive disorder ("OCD"). His symptoms include involuntary movements and vocalizations. He has a four-year college degree and has worked at the Southwestern Vermont Council on Aging as the Volunteer Senior Companion and Caregiver Coordinator since 2014.

On the night of Thanksgiving 2019, shortly after 9:54 p.m., Plaintiff entered Old Navy in Williston, Vermont to shop for Black Friday deals with his brother, Jory Brush, and their friends. When he entered the store, Plaintiff was feeling "stressed and anxious" because he "was sad about [his] dad passing [a]way two years prior, and [he] was recovering from a traumatic [traffic accident.]" (Doc. 126-6 at 39.) He was wearing clothing which he had purchased at Old Navy in previous years. Old Navy was Plaintiff's favorite clothing store, and he typically bought "like his year's worth of clothes" at Old Navy each Black Friday. (Doc. 130-6 at 4.)

Plaintiff spent approximately two hours shopping at Old Navy, including time after his brother and friends left the store. Plaintiff had driven separately from the others, and his cell phone battery died. When he was unable to contact Plaintiff or find him in the store, Jory Brush assumed that Plaintiff had already left, and he and their friends departed as well.

Plaintiff tried on numerous items of clothing at Old Navy. While he was shopping there, he exhibited physical and verbal tics allegedly associated with Tourette's, including bouncing on his heels; reaching to touch his head, cap, or other objects; making abrupt, halting, and jerky movements; and making noises that sounded like he was coughing or clearing his throat several times per minute. At the time, his tics were particularly prominent. He also exhibited behaviors associated with OCD, such as difficulty making decisions and reviewing decisions in "a never-ending cycle." (Doc. 122-2 at 25) (internal quotation marks omitted). He set a canvas Old Navy shopping bag with mesh panels down as he was shopping and sometimes reached down to access the bag or touch the floor. After filling his shopping bag, Plaintiff transferred the bag to a shopping cart, which he also filled with clothes.

Thanksgiving Day was the start of the busiest twenty-four-hour period of the year for the Old Navy store in Williston. Earlier in the day, a Williston police officer entered the store to tell management that the Williston Police Department planned to have a police presence in the area and to encourage store employees to call the police if they needed assistance. Old Navy's policy is that employees do not call the police for shoplifters and are not authorized to call the police to perform a "walk-through." (Doc. 143-19 at 3); *see also* Doc. 130-15 at 5 ("Do NOT call mall security to request that they do a walk-through in your store relating to a specific customer exhibiting potential shoplifting behaviors.") (emphasis in original).

On the night in question, Old Navy Store Manager Joshua Ruff, Merchandise Manager Jennifer Quinones, and Customer Service Manager Sarah Button perceived Plaintiff to be exhibiting "red flag" behaviors they had been taught to notice during a "See Something, Say Something" training Old Navy conducted prior to the holiday shopping season. This training was intended to "raise[] public awareness of the indicators of terrorism and terrorism-related crime, as well as the importance of reporting suspicious activity to . . . state and local law enforcement." (Doc. 137-25 at 2.) "Red flag" behaviors were identified to include "individuals paying more attention to store personnel than the merchandise, the length of time that an individual might be in the store, any time that

13

there's an unattended package in the store would be some of the examples[,]" and "[a]ny aggressive behavior or behavior that could be perceived as aggressive." (Doc. 143-23 at 4.) Old Navy also trains its employees to detect shoplifting. Mr. Ruff explained that "concealing themselves, concealing items, and paying more attention to people in the store than the merchandise" are actions that may identify a potential shoplifter. *Id.* at 3.

Plaintiff did not inform Old Navy's employees that he had Tourette's, nor did he have any obligation to do so. Ms. Quinones has a brother with Tourette's and OCD, but she did not suspect that Plaintiff had Tourette's. *See* Doc. 126-3 at 47. ("Q. Do you feel like [Plaintiff] deserved to be no trespassed? A. His behavior indicated not Tourette's. His behavior indicated a safety risk."). Ms. Button had not heard of Tourette's before the incident. Mr. Ruff was aware of Tourette's and believed it was a mental disability but was unaware of its characteristics prior to the incident.

Ms. Quinones called the Williston Police Department to report Plaintiff as a suspicious customer. She stated: "[T]here's a guy that's been in the store for a few hours now, very suspect. He's inebriated or on some kind of . . . um . . . he's not right[.]" (Doc. 137-43.) She provided a physical description of Plaintiff and further stated: "He hasn't quite left the building with any merchandise or anything, he hasn't crossed that line yet, but if you could have an officer come in --" and "He's literally—yeah, he's wearing all of our merchandise." *Id.* The dispatcher relayed Ms. Quinones's call as follows:

> I need one of the Williston units to break and go over to Old Navy. I have a report of a suspicious male, late 20's early 30's, white, 5'10", wearing a black baseball cap who's been in Old Navy for several hours, believe he's intoxicated, not for sure why he's hanging around.

(Doc. 122-2 at 44, ¶ 208.)

Defendants Graham and Oliver, who were Williston police officers at the time, responded to the call. After Defendant Graham arrived at Old Navy, Mr. Ruff and Ms. Quinones expressed their concerns and advised that Plaintiff was currently in a fitting room. Ms. Quinones described their interaction with Defendant Graham as follows:

> We just gave them -- him the situation, updated him on the situation, and let him know that [Plaintiff] was in the fitting room and that there was nothing

14

> that he could do since he was in the fitting room. He said okay. He says,
> Well, what do you want me to do? And I said, Well, nothing you can do.
> From my recollection. And I gave him a description I believe of what
> [Plaintiff] was wearing. And I said, Well, if he checks out and doesn't take
> anything, I will follow him to the front door and say yes or no if he took
> something or he didn't take anything. And he said, Okay. Well, I'm just
> going to be waiting outside.

(Doc. 122-31 at 36.) Defendant Graham did not remember this conversation but recalled

that Ms. Quinones "was telling me about how he was trying to push out a cart, and

believed that he was staging, and he may be impaired or intoxicated." (Doc. 137-30 at

20.) After speaking with the Old Navy employees, however, he went outside to wait,

where he was joined by Defendant Oliver.

Plaintiff stood in line for approximately thirty minutes before purchasing

approximately $250 of clothing. He left Old Navy at 11:46 or 11:47 p.m. Although he

was not stopped by Old Navy's employees as he left, he was stopped by Defendant

Graham on the sidewalk near the store's front entrance. Defendant Graham asked

Plaintiff for identification and his sales receipt. He told him that Old Navy suspected he

was a shoplifter or under the influence of drugs or alcohol. Plaintiff informed Defendants

Graham and Oliver that he had Tourette's and had not stolen anything. The officers did

not conduct a field sobriety test.

Ms. Quinones stated that the officers stopped Plaintiff before she "got to the door

to – to see the officers to give them a yes or no signal," but she stepped into the vestibule

"shook [her] head or gave hand signals" to "[try] to let the – Officer Graham know that

[Plaintiff] did not take anything." (Doc. 137-34 at 6.) Defendant Oliver followed Ms.

Quinones into the store vestibule, where they spoke for approximately thirty-five

seconds. Ms. Quinones remembers telling Defendant Oliver that Plaintiff "[was] all set.

He paid for his [m]erchandise. He didn't take anything." (Doc. 122-31 at 40.) Defendant

Oliver does not "recall what was said whatsoever" during his conversation with Ms.

Quinones, although he has no reason to dispute what she said she told him. (Doc. 122-9

at 12.)

After Defendant Oliver returned from speaking to Ms. Quinones and rejoined

15

Defendant Graham, Defendant Graham took Plaintiff's driver's license and receipt into Old Navy while Defendant Oliver waited outside with Plaintiff. Plaintiff and Defendant Oliver talked and were "respectful" to each other. (Doc. 122-19 at 231-32.) Defendant Oliver was "nice" to Plaintiff and did not arrest him, use force, or otherwise touch him. *Id.* Defendant Oliver testified that he waited with Plaintiff to "[m]ak[e] sure he didn't leave in case in fact [Defendant] Graham found out he was stealing from the store." (Doc. 137-31 at 8.) Had Plaintiff tried to walk away, Defendant Oliver would have "[t]old him to not leave and he needs to stay with me; he's being detained." *Id.* at 9.

When Defendant Graham entered Old Navy with Plaintiff's driver's license and receipt, he had determined that Plaintiff was not intoxicated and his "sole purpose was to determine whether [Plaintiff] had engaged in retail theft[.]" (Doc. 122-4 at 34.) He took Plaintiff's driver's license with him because "it's just routine procedure to get somebody's ID when you have contact with them to mostly check for wants and warrants." *Id.* Defendant Graham wanted to "see that [Plaintiff] was able to drive and not suspended[,]" because "you don't want to give a license back to somebody that's criminally suspended, or any kind of suspension, and by state law you can't operate a motor vehicle, and then he goes and gets in an accident and then you're asked why you let him drive." *Id.* at 34-35.

Defendant Graham told the Old Navy employees that he had detained Plaintiff and further advised Plaintiff had Tourette's. He asked Ms. Button to "check [the receipt] to see if that's what [Plaintiff] had purchased[,]" which she did. *Id.* at 35. Defendant Graham called dispatch to ask for a check on Plaintiff's criminal record and driver's license, a process that was prolonged by Defendant Graham's radio malfunctioning. The dispatcher asked Defendant Graham to call in using his cell phone instead. The call lasted approximately three minutes and thirty-four seconds. After receiving Ms. Quinones's help in reading the numbers on Plaintiff's license, Defendant Graham asked the dispatcher whether Plaintiff had a record of "any retail thefts or anything." (Doc. 137-43.) The dispatcher and Defendant Graham had the following exchange while the dispatcher looked up Plaintiff's criminal history:

Dispatch: There's 1800 stuff going on, um, doot do doot do doot do dooo, . . . Person of interest in a burg[lary] . . .

Graham: Oh no kidding.

Dispatch: A C&N [careless and negligent driving] . . . Search warrant... operator offender . . .

Graham: Aww.

. . .

Graham: Yeah, so we think he was going to walk out with a cart. He did pay for some items, and now he's telling me I'm prejudiced because he's got Tourette's ...

Dispatch: That's weird. Okay.

Graham: Yeah. So anyways, so any retail thefts or anything?

Dispatch: No, not that's jumping out at me. Um, there's a heroin theft . . . um.

Graham: Okay.

Dispatch: I mean, there's some marijuana, but no one cares about that.

Graham: Yeah, right.

Dispatch: Um, texting and driving.

Graham: Aw, nice.

Dispatch: Let me see what was found with in this search warrant, if anything.

Graham: Okay.

Dispatch: . . . Ceramic marijuana pipe. . . . Blah blah blah blah blah . . . smoking marijuana . . . told his momma. Looks like he was being naughty and someone told his momma on him.

Graham: Aw, nice.

Dispatch: Um, . . . Let me see what this suspicious is.

. . .

Dispatch: Looks like that one's just the more marijuana.

Graham: Okay.

Dispatch: Doot do doot do doot do doot do doo... um . . . drugs, crash with injury, traffic offense ... Meh, he doesn't really have any "theft" stuff other than --

Graham: The POI in the burglary.

17

Dispatch: That burg alarm, yeah. Let me see what's going on with that.

Graham: Okay.

Dispatch: . . . That was in Rutland.

*Id.*

Defendant Graham asked the dispatcher: "Is he valid? . . . Because we don't want him to drive back to Middlebury tonight if we don't have to." *Id.* Once the dispatcher informed Defendant Graham that Plaintiff's driver's license was valid, Defendant Graham remarked to the dispatcher: "All right, well I guess I'm gonna trespass him and kick him loose, I guess." (Doc. 122-2 at 51, ¶ 245.)

After ending the call, Defendant Graham spoke with Ms. Quinones and Mr. Ruff. According to Defendant Graham, because Ms. Quinones "had told me that she believed that [Plaintiff] was wearing merchandise that he came out of the dressing room with[,]" he told the Old Navy employees that "when I go back out I'm going to ask him if he has any stolen merchandise that he's wearing[.]" (Doc. 122-4 at 38-39.) According to the employees, Defendant Graham "informed us that [Plaintiff] had some prior drug offenses on his record" (Doc. 122-34 at 46) which "leads to retail theft." (Doc. 122-31 at 42.) Mr. Ruff testified that Defendant Graham stated: "you know, you're going to have trouble on your hands if you don't trespass him." (Doc. 122-34 at 46) (internal quotation marks omitted.)

Defendant Graham returned to where Plaintiff was waiting with Defendant Oliver and told Plaintiff that he was issuing Plaintiff a No Trespass Order. He sat in his cruiser to write the Order. Defendant Graham then gave the Order to Plaintiff and told him that he was free to go. In doing so, he advised Plaintiff that Old Navy had asked for the No Trespass Order.

Plaintiff testified in deposition that when he asked Defendant Graham why Old Navy requested the Order, Defendant Graham stated "something along the lines of: Well, in Vermont the businesses actually have a right to remove or no trespass anyone for any reason, and it doesn't matter if you have a green shirt on, you walk in that store; they don't like your green shirt, they can no trespass you from that store." (Doc. 122-19 at

137.) According to Plaintiff, Defendant Graham further advised him: "We told them that you have Tourette's. You didn't steal anything. You're clear to go home but there's – they want to serve a no trespass on you." (Doc. 130-7 at 29) (internal quotation marks omitted).

The No Trespass Order stated: "you are hereby given notice from this date forward, that your person or property is no longer permitted on the premises . . . known as Old Navy. This becomes effective immediately, if you are found on this property again, you will be charged with trespassing." (Doc. 143-14.) It indicates it was served at 12:05 a.m. on November 29, 2019.

Plaintiff's detention lasted approximately nineteen minutes. After receiving the No Trespass Order, Plaintiff left the area and drove home. He has not returned to Old Navy since that day and testified that he "never will" shop at an Old Navy store again, even after the No Trespass Order was rescinded. (Doc. 122-19 at 140.)

In January 2020, Plaintiff filed a complaint against Old Navy with the Vermont Human Rights Commission. The complaint recounted Plaintiff's conversation with Defendant Graham about the No Trespass Order and stated that Defendant Graham told Plaintiff that Old Navy requested the Order. On May 5, 2021, Plaintiff filed the instant action, seeking compensatory damages, punitive damages, and attorney's fees and costs, as well as a court order requiring Old Navy to rescind the No Trespass Order.

On November 5, 2021, six months after Plaintiff initiated the instant action, Old Navy sent a letter to Chief Patrick Foley of the Williston Police Department stating that "[i]t ha[d] come to [their] attention that a [N]o [T]respass [O]rder barring Aaron Brush from the Williston, Vermont Old Navy store . . . remains in place." (Doc. 143-16 at 2.) The letter stated: "Old Navy did not request or authorize this [N]o [T]respass [O]rder and, therefore, does not believe that it is valid or enforceable. Please take whatever steps are necessary to ensure that this invalid [N]o [T]respass [O]rder is promptly revoked." *Id.* On November 10, 2021, Chief Foley replied to Old Navy's letter and stated:

> Receipt of your correspondence dated November 5, 2021 is acknowledged. Contrary to your letter, Williston Police Department believes that it acted at

> the request of Old Navy personnel. Be that as it may, the [N]o [T]respass
> [O]rder has been removed from the trespass file in response to Old Navy's
> request in the November 5, 2021 letter.

(Doc. 143-17 at 2.)

Plaintiff claims his detention and the No Trespass Order caused him to experience "psychological symptoms consistent with diagnoses of complex post-traumatic stress disorder, depression and obsessive[-]compulsive disorder" and "substantially worsened his pre-existing clinical conditions." (Doc. 130-3 at 3.) Following the incident at Old Navy, he received mental health counseling and treatment.

The Town hired Defendant Graham as a police officer in June of 2000 and promoted him to Sergeant in September of 2015. It hired Defendant Oliver as a police officer in September of 2018.

The Vermont Criminal Justice Training Council ("VCJTC") "maintain[s] a uniform standard of basic training for law enforcement applicants and in-service training for law enforcement officers" and "shall offer and approve continuing programs of instruction in up-to-date methods of law enforcement and the administration of criminal justice." 20 V.S.A. §§ 2351(b)-(c). Both Defendants Graham and Oliver completed the VCJTC training required by the State of Vermont to become police officers, as well as additional training to maintain their status as officers and gain additional certifications.

VCJTC began requiring Fair and Impartial Policing training in 2018. When VCJTC adopted a Fair and Impartial Policing policy in 2018, the Town updated its existing Fair and Impartial Policing General Order to comply with VCJTC's policy. In November 2019, the Town's Fair and Impartial Policing General Order provided:

> Employees are prohibited from engaging in biased policing. This means no
> member of the Williston Police Department shall take actions based on any
> personal characteristics, or immigration status, except as described below,
> in the services our employees provide to the community in connection with
> our law enforcement activities.
>
> . . .
>
> As required by law, all enforcement actions by law enforcement officers,
> such as investigation, detentions, traffic stops, arrests, searches and
> seizures, etc. must be based on reasonable suspicion, probable cause or

> other or relevant exigent circumstances, supported by articulable facts,
> circumstances, and conclusions that support the given action.

(Doc. 122-11 at 1, 3.) Defendant Graham believed that he received Fair and Impartial
Policing training but remembered completing only three hours of training on the subject
prior to November 2019.

During the relevant time period in November 2019, the Town's Field Interview
and Pat-Down Searches General Order provided:

> A. Law enforcement officers may stop individuals for the purpose of
> conducting a field interview only where reasonable suspicion is present. . . .
>
> B. Based on observance of suspicious circumstances or upon information
> from investigation, an officer may initiate the stop if he/she has articulable,
> reasonable suspicion to do so. The following guidelines shall be followed
> when making an authorized stop to conduct a [field] interview.
>
> . . .
>
> 4. Officers shall confine their questions to those concerning the suspect's
> identity, place of residence and other inquiries necessary to resolve the
> officer's suspicions. However, in no instance shall an officer detain a
> suspect longer than is reasonably necessary to make these limited inquiries.

(Doc. 122-2 at 7) (emphasis omitted). Defendant Graham did not remember receiving
training in searches and seizures between 2014 and 2020, and he was unsure whether he
received search and seizure law training in 2013. He testified during a 2011 deposition
that "I am not prejudiced towards people. If I was going to be prejudiced it would
definitely be Middle Easterners, and I am not." (Doc. 137-20 at 3.)

In 2008, Antoinette Bennett-Jones filed a civil lawsuit against Defendant Graham
alleging claims of assault, battery, excessive force, improper seizure, and false arrest. Ms.
Bennett-Jones was a young, pregnant Black woman who alleged that Defendant Graham
detained her without reasonable suspicion while issuing a traffic citation, then allegedly
quickly and unjustifiably escalated the encounter using unnecessary physical force. She
also brought *respondeat superior* and § 1983 claims against the Town, which she alleged
maintained a "custom and practice of bullying and administering on-the-spot
punishments to people they do not like." (Doc. 122-22 at 13, ¶ 74.)

The Judicial Bureau hearing officer found both Ms. Bennett-Jones and Defendant

Graham to be credible and entered judgment on the traffic citation in Ms. Bennett-Jones's favor. The Town settled Ms. Bennett-Jones's subsequent civil case against it, and Defendant Graham testified in deposition that he did not experience any adverse employment consequences or receive any training as a result of the incident. *See* Doc. 122-18 at 3 ("Q. Were there any consequences to you at work as a result of the incident? A. No. Q. Was there any training to you as a result of the incident? A. No.").

In May 2011, a Williston Police Department Internal Investigation Report was produced in response to allegations that Defendant Graham and another officer used the CAD criminal background check database to access the information of another employee's son. The employee complained that the search was conducted to harass her and lacked a legitimate law enforcement purpose. The investigator concluded that the evidence "support[ed] a legitimate law enforcement reason for running [the son's] record" but observed that the incident "provide[d] an example of the level of suspicion and lack of trust within the organization." (Doc. 137-9 at 9.) Defendant Graham was neither reprimanded nor disciplined for his actions, although he acknowledged that it "was a very poor choice on [his] part[.]" (Doc. 137-30 at 15.)

In 2017, the Town hired an outside entity to investigate allegations that a Williston Police Department employee was conducting personal business while on duty. The investigator produced a report (the "Troidl Report") describing interviews with numerous Williston Police Department employees. While the report concluded no criminal wrongdoing had occurred, it also documented concerns that various employees had regarding the leadership of then-Police Chief Todd Shepard. One employee, Dispatcher Ben Hollwedel, stated that "he could list hundreds of egregious behaviors similar to the allegations against [the employee accused of conducting personal business,]" that there was "a lack of accountability" under Chief Shepard, and that "employees could do whatever they wanted without recourse." (Doc. 137-10 at 11) (internal quotation marks omitted). The Troidl Report stated that Defendant Graham advised the investigator that "Chief Shepard 'had no clue' what was going on and that if he did know, he was ignoring it." *Id.* at 5. Defendant Graham testified in deposition that although he disagreed that

Chief Shepard was "not around[,]" Chief Shepard was "a little bit more lenient than the other Chiefs[,]" was not "a strong Chief[,]" and expressed "favoritism" towards the employee accused of conducting personal business while on duty. (Doc. 137-30 at 15-16.)

Chief Foley became the Williston Police Chief in October 2017. The employee who was the subject of the Troidl Report investigation resigned within hours of Chief Foley's employment. When Chief Foley read the Troidl Report one month after becoming Chief, he concluded that he "had a very dysfunctional police department." (Doc. 137-32 at 8.) He did not revise any policies or procedures in response to the report, but he "became very visible and very active in the day-to-day operation of the police department and offered guidance to everybody." *Id.* He also appointed one officer to head a new "internal affairs unit" and planned to appoint additional officers to the unit. *See id.* at 8-9. ("[M]y plan is that as we add people, you know, we need other people to do investigations, we can't just rely on one person; he'll get burnt out."). Chief Foley testified that the Williston Police Department has been understaffed for five years and that he is currently "shorthanded" but that if he could hire nine additional officers, he "can make it work." *Id.* at 6.

Chief Foley has recommended the termination of three Williston Police Department employees and disciplined officers between six and twelve times. In June 2020, Chief Foley was notified of an "extremely offens[ive]/derogatory remark about [an African American female" made by Defendant Graham "during his shift on Sunday, May 31, 2020." (Doc. 122-25 at 1) (emphasis omitted). Chief Foley suspended Defendant Graham, who subsequently resigned after receiving notice from the Town Manager that the Town planned to terminate his employment.

In 2020, Chief Foley discovered that Defendant Oliver had made false or misleading statements on his employment application and that he was the subject of a criminal investigation related to leaving the scene of an accident, providing false information to a police officer, unlawful mischief, and domestic assault. Defendant Oliver resigned from the Williston Police Department in September 2020. Neither he nor

Defendant Graham is eligible to be rehired.

In 2021, Vermont State's Attorney Sarah George issued a *Brady* letter for former Williston Police Officer Travis Trybulski finding that he was in violation of the Fair and Impartial Policy. Mr. Trybulski is no longer employed by the Williston Police Department.

In February 2021, the Town adopted General Order #192, Trespassing (the "Trespassing General Order"), which "codified the existing unwritten policy regarding trespass orders." (Doc. 122-2 at 9, ¶ 26.) The Trespassing General Order provides: "The issuance of a notice against trespass is a civil process between a property owner and a person." (Doc. 122-16 at 1.) It further states:

> It is incumbent on the police to assess complaints for the potential motivation, beyond reporting criminal behavior, on the part of complainants, including those bias[es] in nature or directly targeted at a member of the public's protected class (Race, color, religion, national origin, disability, sex, marital status, age, sexual orientation, or gender identity).

*Id.* at 2.

### D.    The Disputed Facts.

The parties disagree regarding the nature of Plaintiff's behavior while he was in the Old Navy store. Mr. Ruff believed Plaintiff was demonstrating "atypical" behavior for a shopper by "moving quickly" and "erratically" through the store (Doc. 122-34 at 27, 37, 58) and cutting past other customers in a way that was "just a little bit like off." (Doc. 143-24 at 3.) He noticed that Plaintiff was alone, "didn't seem to be shopping with a purpose[,]" and repeatedly returned to a bag that he left near the front of the store. *Id.* at 4. He stated that "the sounds that [Plaintiff] was making could have been perceived as gun shots" or "like a bomb noise." (Doc. 122-34 at 30, 33.)

Ms. Quinones heard Plaintiff "mak[e] machine gun[-]type noises" whenever he was approached by an employee and observed Plaintiff "bang his forehead and make other noises[.]" (Doc. 137-26 at 7.) She later reported that Plaintiff "would duck behind tables and was always watching employees[,]" *id.*, and she noted the lengthy amount of time he spent in the store "put up kind of a red flag." (Doc. 137-36 at 7.)

Plaintiff denies that he was watching or staring at store employees or that his vocal tics sounded like gunfire or bomb noises. *See* Doc. 137-28 at 7 ("Q. . . . Were you watching any of the Old Navy employees while you were in the store on that night of November 28, 2019? A. No, I wasn't. I wasn't paying attention to any of the employees, really, no."); *id.* at 9 (Q. . . . And were you making noises while you were at the Old Navy store on November 28th of 2019? A. Just my like clearing throat noise and my subtle tics that you've heard today. . . . My verbal tics, it kind of sounds like coughing or clearing a throat or, whatever."). He denies that when Mr. Ruff attempted to approach him he deflected those attempts by making gunshot noises or throwing his arm in front of his face.

Old Navy points to deposition testimony by Ms. Button that other employees expressed concern to her about the noises Plaintiff was making and deposition testimony by Mr. Ruff that he observed uncomfortable body language and facial expressions made by customers and employees in response to Plaintiff's movements and vocalizations. Ms. Button testified that she "believe[s] that in today's society you can't be [too] careful about something like that going on because you never know what's going to happen." (Doc. 130-16 at 7.) Ms. Quinones further stated that Plaintiff "leaving a bag by the front door full of merchandise" was a safety concern because "[t]here could be anything in that bag that we don't know of. Could be a bomb in there. We don't know." (Doc. 137-34 at 4-5.) She noted that her concerns were also informed by "the recent bombings and shootings that were in the country at the time of that incident," such as the "Pulse Nightclub shooting." *Id.* at 4-5. Mr. Ruff similarly explained that "it was very strange to me that [Plaintiff's] bag was unattended at the front of the door" (Doc. 122-34 at 35) and "my thought was like what else, like what else was in that bag, and I didn't know." (Doc. 143-24 at 5.)

Plaintiff disputes store management's statement that they decided to call the police "because he was making those noises, [and] we just wanted to be on the safe side . . . for the customers, and so we made the decision to have that call made . . . for safety reasons." Doc. 130-16 at 9; *see also* Doc. 130-12 at 14 ("[T]hat is the reason why we did

the actions we did that night, as a safety reason. Surely safety only."). He contends that
the Old Navy employees were not genuinely alarmed and did not have genuine safety
concerns because they did not communicate any safety concerns to the police when they
called dispatch or thereafter. He notes that in Ms. Quinones's call to the police, she stated
only that he was "very suspect," "inebriated" or "not right," and that "[h]e hasn't quite
left the building with any merchandise or anything, he hasn't crossed that line yet[.]"
(Doc. 137-43.) He also cites testimony by Defendant Graham that neither Ms. Quinones
nor the other Old Navy employees told him that Plaintiff "represented a safety
concern[.]" (Doc. 137-30 at 20.) When Ms. Quinones was asked whether she was
"concerned about whether [Plaintiff] had a gun, a bomb, or a weapon on his person[,]"
she replied: "I don't remember feeling that way. I could have. I don't remember." (Doc.
122-31 at 100.)

Plaintiff observes that the shopping bags Old Navy provides to customers are
see-through mesh, although Mr. Ruff testified, "We call them mesh bags because there's
paneling on it that's mesh, but it's also canvas so – and it's also dark navy in color, so
you can't really see into it when it's in use." (Doc. 137-33 at 6.)

After Old Navy's employees told Defendant Graham that Plaintiff's receipt was
valid, they claim they informed Officer Graham that no police assistance was necessary.
After Ms. Button told Defendant Graham that the receipt was legitimate, she "indicated
that due to the validity of the receipt, that we didn't want anything more to do with it and
then walked away[,]" although Mr. Ruff and Ms. Quinones continued speaking with
Defendant Graham. (Doc. 126-5 at 25.) According to Mr. Ruff, Ms. Button handed the
receipt back to Defendant Graham and "basically told him that the – there was no
situation." (Doc. 126-4 at 12.)

Plaintiff denies that Old Navy's employees told Defendant Graham that no further
assistance was necessary, pointing to testimony that Ms. Quinones subsequently assisted
Defendant Graham in reading Plaintiff's license so that he could run a record check on
Plaintiff. He also notes that the No Trespass Order issued and that when Defendant
Graham left the building, he did not "remember Ms. Button telling [him] that Old Navy

26

did not need any further assistance[.]" (Doc. 126-12 at 136.)

The parties disagree regarding the circumstances of Defendant Graham's issuance of the No Trespass Order. Defendant Graham claims that Ms. Quinones asked him to issue the Order and that if the Old Navy employees had "asked [him] not to issue a [No] Trespass Order, it wouldn't have been issued[,]" because he "need[s] permission from the resident or business owner or representative to issue a trespass." (Doc. 122-4 at 41-42.) Somewhat inconsistently, he maintains that the Old Navy employees did not tell him that he should *not* issue the No Trespass Order. (Doc. 122-1 at 16) (citing the employees' testimony at Doc. 122-2 at 53-55, ¶¶ 253, 254, 256); *see also* Doc. 122-2 at 54-55, ¶ 256 ("Q. Well, did anybody say we're telling you not to issue a no trespass order? A. I don't remember. I personally did not."). In his report after the incident, Defendant Graham wrote: "Management requested I trespass the individual. When he exited the store I approached him and . . . I then served him a [No] [T]respass [O]rder on behalf of Old Navy[.]" (Doc. 130-20 at 5.)

Ms. Quinones and Store Manager Joshua Ruff claim that when Defendant Graham asked them about whether he should issue Plaintiff the No Trespass Order, they responded that Plaintiff did nothing wrong, to which Defendant Graham replied: "I can trespass anybody from anywhere at any time for any reason." (Doc. 122-34 at 47) (internal quotation marks omitted.)[4] Defendant Graham does not recall making this

---

[4] Mr. Ruff testified that after Defendant Graham informed him and Ms. Quinones that Plaintiff had prior drug offenses on his record,

> Officer Graham had continued on and said, "you know, you're going to have trouble on your hands here if you don't trespass him." And I was like kind of indignant at that point, and I was like, "well, how can you trespass somebody that hasn't done anything?" And then he had responded back to me, "oh I can trespass anybody from anywhere at any time for any reason."

(Doc. 122-34 at 46-47.) Ms. Quinones provided similar testimony:

> Q. At any time was there a conversation about a no trespass order?
>
> A. Yes.
>
> Q. Can you describe for us the substance of that conversation?

statement and disavowed any belief that that he could issue a no trespass order for any reason. *See* Doc. 122-4 at 40 ("Q. Did you at any point say to store employees that you could issue a no trespass [order] to anyone for any reason at any time? A. I don't recall that conversation. Q. Was that a belief that you held as of that time? A. That I could trespass anybody? No, absolutely not.").

Plaintiff testified during an interview with the Vermont Human Rights Commission that when Defendant Graham gave him the No Trespass Order, he stated that if a store doesn't like someone, "they don't have to have a reason as long as it's non-discriminatory, to, to ban them from the store." (Doc. 122-29 at 48.) He further testified that Defendant Graham told Jory Brush that "it's up to the store if they want to no trespass you[;] they can as long as it's non-discriminatory." *Id.* at 48-49. Although Plaintiff subsequently testified during his deposition that he no longer remembered Defendant Graham saying this, he stated that his prior interview testimony must be correct.

Jory Brush called Defendant Graham after the incident. He described their conservation as follows:

> I remember him clearly stating that he personally had no problem with [Plaintiff]. He thought [Plaintiff] was being polite and respectful. He said that it was Old Navy that wanted to put the no trespassing on him, and he told me that they're able, they're allowed to do that, and that's when I argued with him and said, "No, they're not allowed to do that," you know. And then that's when I asked him if he was familiar with the Americans with Disabilities Act and Tourette's and all that and which he claimed, no, he did not know what Tourette's was and he claimed that, no, he did not know what the ADA was. And I kind of felt like he was, ["]oh, it's just easier, like it's just easier for me to just pretend like I don't know any of it.["] I didn't really truly belie[ve] what he was saying, but it was the easier way out for him.

---

A. Officer Graham asked us what we would like him to do in the situation. I believe me and Joshua responded, Well, nothing you can do. He didn't take anything. There's no – he's left the building. Nothing we can do. And I believe Officer Graham says, Well, we can trespass anybody any time for any reason.

(Doc. 122-31 at 43.)

(Doc. 137-29 at 8.)

Ms. Quinones testified that she left the conversation after Defendant Graham's comment that he could trespass anyone at any time. Mr. Ruff claims that he "never requested a no trespass order[.]" (Doc. 122-34 at 48.)[5] Plaintiff argues that this testimony is not credible because Old Navy did not rescind the Order until twenty-three months after the incident, and six months after he filed this action, in which he sought the Order's

---

[5] Mr. Ruff testified:

> Q. Did [Officer Graham] indicate that he planned on issuing a no trespass order to [Plaintiff]?
>
> A. I mean, he did say "you're going to have trouble on your hands if you don't trespass him," so I would say yes.
>
> . . .
>
> Q. Did you have any response for Officer Graham when he handed you this no trespass order?
>
> A. I took it because he brought it back in to me. I was kind of again, uncomfortable with that having happened because I didn't ask for that to happen. But at that point in time [Plaintiff] had been outside of the store, the safety and security of the store was, you know, the priority, and that was neutralized, so I just kept it because it was a formal piece of paperwork from the police. And I would have, I'm sure, filed it in the office. . . .
>
> Q. It's Officer Graham's position that the store requested the no trespass order. Do you disagree with that?
>
> A. Yes. I never requested a no trespass order, because I don't have the authority to do that. I didn't even know that that was possible.
>
> Q. Did you tell him not to issue the no trespass order?
>
> A. Through my response to him indignantly saying like "how can you trespass somebody that didn't do anything wrong," I would say yes. Not in those precise words, but it was clear that I was not following how that would be possible.
>
> Q. Well, when he came back and handed you the no trespass order did you tell him -- did you take issue with it in any way? Did you tell him "we don't want this"?
>
> A. I don't necessarily know that I had an opportunity to. He had brought it in and handed it to me, and I didn't even really know what it was before he was, you know, out the door.

(Doc. 122-34 at 47-49.)

rescission. Plaintiff also contends that both his brother and his girlfriend, Chelsey Lattrell, called Old Navy to complain about how Plaintiff had been treated. Several hours after the incident, Jory Brush called Ms. Button and stated that the Old Navy employees "were not allowed to discriminate against his brother and that he was going to seek legal representation the very next day." (Doc. 122-35 at 79-80.) Ms. Button provided him with her name, Mr. Ruff's name, and the Old Navy 1-800 number.

With regard to the motivation for the No Trespass Order, Old Navy cites Defendant Graham's testimony that he did not "believe that Old Navy's employees wanted [Plaintiff] no trespassed based on his personal characteristics" because "that was never mentioned." (Doc. 122-4 at 39.) Plaintiff counters that, during the incident, both the police officers and Old Navy's employees were advised that he has Tourette's.

Plaintiff and Old Navy also dispute whether the No Trespass Order prevented him from returning to the store. Old Navy contends that its denials of Plaintiff's allegations throughout the instant action and during proceedings related to Plaintiff's Vermont Human Rights Commission complaint, as well as the testimony by its employees that they did not ask for the Order and would not have enforced it, should have indicated to Plaintiff that he could have returned to the Williston Old Navy at any time. Plaintiff counters that the language of the No Trespass Order indicated that he was not permitted to return and would be subject to trespass charges if he did so. He testified that Defendant Graham advised Plaintiff he could be arrested if he returned. He points out Old Navy maintained the No Trespass Order even when they claimed it was issued without their authority. *See* Doc. 130-3 at 4 ("When the cops came out he said they were giving me a No Trespass [O]rder. It's still in effect even though they know it was a mistake.").

### E. Whether Defendants Graham and Oliver Are Entitled to Summary Judgment on Plaintiff's 42 U.S.C. § 1983 Claim.

Defendants Graham and Oliver argue that they are entitled to qualified immunity from Plaintiff's 42 U.S.C. § 1983 and false imprisonment claims because their conduct did not violate Plaintiff's Fourth Amendment rights, and even if they violated Plaintiff's constitutional rights, any violation was not clearly established. Defendant Oliver further

argues that he was not personally involved in any constitutional violation of Plaintiff's rights.

"The issue of immunity . . . differs as between the state and federal law claims." *Cornejo v. Bell*, 592 F.3d 121, 130 (2d Cir. 2010). Defendants Graham's and Oliver's qualified immunity from Plaintiff's § 1983 claim is "a question of federal law" while their qualified immunity from Plaintiff's state law false imprisonment claim is "a question of state law[.]" *Gross v. Rell*, 585 F.3d 72, 86 (2d Cir. 2009). The qualified immunity doctrines under federal law and Vermont law may therefore yield divergent outcomes. *See O'Connor v. Donovan*, 2012 VT 27, ¶ 16, 191 Vt. 412, 422, 48 A.3d 584, 590.

To maintain a § 1983 action, "two essential elements must be present: (1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994). In this case, it is undisputed that Defendants Graham and Oliver were acting at all relevant times under color of state law.

The doctrine of "[q]ualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "[C]ourts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Although on summary judgment the "facts are viewed in the light most favorable" to the nonmoving party, when a "case concerns the defense of qualified immunity, . . . the [c]ourt considers only the facts that were knowable to the defendant officers." *White v. Pauly*, 580 U.S. 73, 76-77 (2017) (citations omitted).

### 1.   Whether Defendants Graham or Oliver Violated Plaintiff's Constitutional Rights.

Plaintiff alleges that Defendants Graham and Oliver:

> violated [Plaintiff's] Fourth Amendment right to be free from unreasonable searches and seizures by detaining him at length, and searching his personal belongings for evidence of theft, without probable cause and without any reasonable suspicion that [Plaintiff] had engaged in criminal conduct.

(Doc. 9 at 8, ¶ 42.)

The U.S. Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. CONST. Amend. IV. Pursuant to the Fourth Amendment, a law enforcement officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). The Supreme Court has "adopted a dual inquiry for evaluating the reasonableness of an investigative stop." *United States v. Sharpe*, 470 U.S. 675, 682 (1985). Under this approach, the court first examines "whether the officer's action was justified at its inception" by the officer's reasonable suspicion of criminal activity. *Id.* (internal quotation marks omitted) (quoting *Terry*, 392 U.S. at 20). It next determines "whether [the detention] was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.*

Reasonable suspicion requires "specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting wrongdoing[.]" *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (internal quotation marks omitted). "Like probable cause, reasonable suspicion is determined based on the totality of the circumstances but 'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.'" *United States v. Elmore*, 482 F.3d 172, 179 (2d Cir. 2007) (quoting *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002)). "In determining whether a reasonable suspicion exists, the court's inquiry is an objective one and 'the subjective intentions or motives of the officer

making the stop are irrelevant.'" *United States v. Senna*, 2022 WL 575384, at \*5 (D. Vt. Feb. 25, 2022) (quoting *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000)).

An investigatory stop must be justified at its inception. "Any events that occur after a stop is effectuated cannot contribute to the analysis of whether there was reasonable suspicion to warrant the stop in the first instance." *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013). An officer's reasonable suspicion may be based on "information supplied by another person" rather than on his personal observation, provided the informant's information has sufficient "indicia of reliability." *Adams v. Williams*, 407 U.S. 143, 147 (1972).

Plaintiff does not "dispute that his detention was valid at its inception." (Doc. 137 at 13.) Ms. Quinones called the police to report Plaintiff as a potential shoplifter and provided a physical description of him. When Defendants Graham and Oliver arrived at Old Navy, the officers knew that they had been asked to respond to a report of a "suspicious male" who had been in the store for several hours and may be "intoxicated." (Doc. 122-2 at 44, ¶ 208.) After arriving at the store and speaking with staff, Defendant Graham understood that the Old Navy employees believed Plaintiff may be impaired or intoxicated and may have been preparing to push a shopping cart filled with clothes out into the parking lot without paying. These constituted specific, articulable facts supporting a reasonable suspicion of criminal activity.

Although the officers did not personally observe Plaintiff's behavior before he exited the store, they were entitled to rely upon the employees' personal observations, as the "veracity of identified private citizen informants (as opposed to paid or professional criminal informants) is generally presumed in the absence of special circumstances suggesting that they should not be trusted." *Elmore*, 482 F.3d at 180; *see also Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) ("[I]nformation provided by 'an identified bystander with no apparent motive to falsify' has 'a peculiar likelihood of accuracy,' and we have endorsed the proposition that 'an identified citizen informant is presumed to be reliable.'") (internal citation omitted) (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 163 (2d Cir. 2002)); *United States v. Rollins*, 522 F.2d 160, 164 (2d Cir. 1975) (observing that

the Supreme Court and Second Circuit "have recognized personal observation as a reliable basis for an informant's report"). Defendants Graham's and Oliver's initial stop of Plaintiff was therefore supported by reasonable suspicion.

Even if reasonable suspicion justifies the initiation of a stop, the stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Sharpe*, 470 U.S. at 682. Although "the scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case[,]" "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

"Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* The Supreme Court has declined to establish a "*per se* rule that a 20-minute detention is too long to be justified under the *Terry* doctrine[,]" *Sharpe*, 470 U.S. at 686 ("[O]ur cases impose no rigid time limitation on *Terry* stops."), and courts have found investigatory stops lasting twenty minutes or more to be reasonable for Fourth Amendment purposes.[6]

Plaintiff argues that several seconds after the officers detained him, Ms. Quinones informed Defendant Oliver that Plaintiff had not stolen anything, a conversation that lasted for less than a minute. He asserts that because he had already informed the officers that he had Tourette's and was not intoxicated, at this point the officers' investigation should have ended and his continuing detention was unreasonable under the Fourth Amendment. Under *Terry v. Ohio*, however, a police officer with reasonable suspicion is not required to accept a suspect's version of events. *See Adams*, 407 U.S. at 145-46

---

[6] *See, e.g.*, *United States v. Sharpe*, 470 U.S. 675, 688 (1985) (finding a 20-minute detention to be reasonable); *Grice v. McVeigh*, 873 F.3d 162, 168 (2d Cir. 2017) (holding *Terry* stop did not ripen into *de facto* arrest where suspect was handcuffed for thirty-three minutes while officers searched for potential bomb); *United States v. Stambler*, 629 F. App'x 104, 108 (2d Cir. 2015) (holding that the Fourth Amendment was not violated where a police officer questioned a suspect for thirty minutes "[w]ithout brandishing a gun or handcuffing [the suspect]"); *United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995) (declining to hold that a thirty-minute detention based on reasonable suspicion is *per se* too long).

(citing *Terry* and observing that "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time"). After Defendant Oliver returned from speaking to Ms. Quinones, Defendant Graham took Plaintiff's driver's license and receipt into Old Navy and confirmed with the store employees that the receipt was valid.[7]

Thereafter, Defendant Graham called dispatch to ask for a background check on Plaintiff's criminal record and driver's license. By speaking with Plaintiff, the Old Navy employees, and dispatch regarding Plaintiff's condition and the validity of his receipt and license, Defendants Graham and Oliver determined that Plaintiff had not stolen anything, was not intoxicated, and could legally drive home.

Taking Plaintiff's receipt into Old Navy to verify its validity was an investigative step reasonably related in scope and duration to the issue of whether Plaintiff had committed retail theft; whether Defendant Graham's call to dispatch to check the validity of Plaintiff's license and criminal history is a closer question. Several Circuit Courts of Appeals have held that obtaining an individual's driver's license and performing a warrant check falls within the scope of a lawful *Terry* stop.[8] Although checking the

---

[7] Controlling precedent supports a conclusion that the retention of a person's identification or driver's license may constitute a seizure. *See Florida v. Royer*, 460 U.S. 491, 501 (1983) (holding defendant was "effectively seized for the purposes of the Fourth Amendment" where narcotics agents identified themselves and asked him to accompany them to a police room while retaining his driver's license and airplane ticket); *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992) (listing "prolonged retention of a person's personal effects, such as . . . identification" as a factor suggesting that a seizure has occurred); *see also United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990) (finding no seizure where officers "promptly returned" the defendant's airplane tickets and driver's license after examining them).

[8] *See, e.g., Klaucke v. Daly*, 595 F.3d 20, 26 (1st Cir. 2010) (collecting cases and observing that "most circuits have held that an officer does not impermissibly expand the scope of a *Terry* stop by performing a background and warrant check, even where that search is unrelated to the circumstances that initially drew the officer's attention"); *United States v. Young*, 707 F.3d 598, 606 (6th Cir. 2012) (adopting holding that "officers do not exceed the permissible scope of a *Terry* stop by running a warrant check, even when the warrant check is unrelated to the crime suspected" because "[t]his procedure may help clear a person's name or may give the officers

Plaintiff's license and criminal history arguably were not directly related to Defendant Graham's reasonable suspicion for the *Terry* stop, they were not wholly extraneous either, and the officers were not "dilatory" and there was no "delay unnecessary to the legitimate investigation of the law enforcement officers." *Sharpe*, 470 U.S. at 687.

Once dispatch informed Defendant Graham that Plaintiff's driver's license was valid and that Plaintiff had no history of retail theft, Defendant Graham re-entered Old Navy to speak with the employees about issuing a No Trespass Order before returning to where Plaintiff was waiting with Defendant Oliver. The parties disagree regarding the circumstances of Defendant Graham's issuance of the No Trespass Order, as well as whether Defendant Graham exceeded the scope of the officers' legitimate investigation and unnecessarily prolonged Plaintiff's detention to issue an arguably unauthorized Order.

While Ms. Quinones and Mr. Ruff claim that they did not ask Defendant Graham to issue the Order, Defendant Graham maintains that he would not have issued the Order if the employees had not. Alternately, he contends that the Old Navy employees did not affirmatively tell him not to issue the Order.

Defendants Graham and Oliver further assert that, even crediting the Old Navy employees' testimony, the record only supports the "reasonable inference" that Defendant Graham misunderstood their intent with regard to the No Trespass Order and that a reasonable mistake of fact does not deprive them of qualified immunity. (Doc. 122-1 at 18.) "[T]he reasonableness of a mistake of fact regarding the [alleged constitutional violation] does not pertain to the ultimate qualified immunity determination, but rather whether there was a constitutional violation in the first instance[.]" *Jones v. Treubig*, 963 F.3d 214, 231 (2d Cir. 2020). "A mistake of fact, however, in the absence of an additional jury finding that the mistake was reasonable (when there are disputed material facts on that question) is insufficient to support an

---

important information about the suspect") (internal citations omitted) (citing *United States v. Villagrana-Flores*, 467 F.3d 1269, 1275 (10th Cir. 2006)).

officer's claim that he is entitled to qualified immunity[.]" *Id.* at 228. Contrary to Defendants Graham's and Oliver's assertion, drawing all reasonable inferences in Plaintiff's favor, a reasonable jury could conclude that any mistake of fact by Defendant Graham was not reasonable.

Because a genuine issue of material fact exists regarding whether Defendant Graham had Old Navy's permission to issue the No Trespass Order to Plaintiff and, if not, whether his mistake of fact was reasonable, whether there was a Fourth Amendment violation cannot be resolved on summary judgment. *See Royer*, 460 U.S. at 500 ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."); *see also United States v. Gomez*, 877 F.3d 76, 93 (2d Cir. 2017) (holding a "traffic stop violated the Fourth Amendment under *Rodriguez* [*v. United States,* 575 U.S. 348 (2015)] because [the officer] prolonged the traffic stop by asking unrelated investigatory questions and the district court made no finding that [the officer] had independent reasonable suspicion of a different offense"). The court thus turns to the issue of whether the right in question was clearly established. Before it does so, it addresses Defendant Oliver's separate argument that he was not personally involved in any constitutional violation.

### 2.   Whether Defendant Oliver Was Personally Involved in the Alleged Constitutional Violation.

Defendant Oliver argues that his personal involvement in the alleged constitutional violation was "so minimal that his conduct cannot be deemed the cause of any deprivation [of] Plaintiff's constitutional rights." (Doc. 123 at 3.) Although he joined Defendant Graham while he was waiting for Plaintiff to leave Old Navy, his actions consisted of speaking with Ms. Quinones in the store's vestibule and waiting with Plaintiff while Defendant Graham went into Old Navy. He did not have physical contact with Plaintiff and was not involved in the decision to issue the No Trespass Order.

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*,

720 F.3d 133, 138 (2d Cir. 2013); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (observing that "vicarious liability is inapplicable to *Bivens* and § 1983 suits"). Personal involvement may mean "direct participation[,]" such as "personal participation by one who has knowledge of the facts that rendered the conduct illegal[,]" or "indirect" participation, "such as ordering or helping others to do the unlawful acts[.]" *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted).

It is a question of fact whether Defendant Oliver knowingly and intentionally assisted in allegedly unlawfully prolonging the stop to issue the No Trespass Order. *See Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (explaining that "direct participation" requires "intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal") (internal quotation marks omitted). Defendant Oliver testified that the "purpose of [his] standing there with [Plaintiff]" while Defendant Graham was inside Old Navy was "[m]aking sure [Plaintiff] didn't leave in case in fact [Defendant] Graham found out he was stealing from the store." (Doc. 137-31 at 8.) His personal involvement was therefore essential to Plaintiff's continued detention. If Plaintiff's detention was unconstitutionally prolonged, by facilitating that detention Defendant Oliver "help[ed] [Defendant Graham] to do the unlawful act[]" and personally participated in the constitutional deprivation. *See Provost*, 262 F.3d at 155.[9]

For the foregoing reasons, the court cannot find as a matter of law that Defendant

---

[9] In response to Defendant Oliver's motion for summary judgment, Plaintiff argues in the alternative that Defendant Oliver may be held liable for failure to intervene on his behalf when he was unlawfully seized by Defendant Graham. "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). Because "a defendant 'cannot be liable for both the underlying constitutional deprivation and a failure to intervene to stop [himself] from committing that violation[,]'" however, "[p]laintiffs may not assert a failure to intervene claim against a defendant who they have plausibly alleged was personally involved in the underlying violation." *Case v. City of New York*, 233 F. Supp. 3d 372, 402 (S.D.N.Y. 2017) (first alteration in original) (quoting *Marom v. City of New York*, 2016 WL 916424, at *19 (S.D.N.Y. Mar. 7, 2016)). In addition, Plaintiff has failed to allege a failure to intervene claim in his Complaint.

Oliver was not personally involved in any violation of Plaintiff's Fourth Amendment rights.

### 3. Whether the Right Allegedly Violated Was Clearly Established.

Even if Defendants Graham and Oliver unconstitutionally prolonged Plaintiff's detention, they are still "entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Kerman v. City of New York*, 374 F.3d 93, 108 (2d Cir. 2004). "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks and citations omitted). The legal principle at issue must have a "high degree of specificity" so it "is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 590 (internal quotation marks and citations omitted).

Whether a right was clearly established is a question of law. *Id.* "In contrast, the matter of whether a defendant official's conduct was objectively reasonable, *i.e.,* whether a reasonable official would reasonably believe his conduct did not violate a clearly established right, is a mixed question of law and fact." *Kerman*, 374 F.3d at 109.

"Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Torcivia v. Suffolk Cnty., New York*, 17 F.4th 342, 367 (2d Cir. 2021), *cert. denied*, 143 S. Ct. 438 (2022) (mem.) (internal quotation marks omitted) (quoting *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004)). In making this determination, the court "look[s] to 'the specific context of the case' at bar rather than 'broad general proposition[s].'" *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)) (second alteration in original).

Plaintiff argues only: "By continuing to detain [Plaintiff] once he became aware that [Plaintiff] was both sober and innocent of any wrongdoing, Defendant Graham violated clearly established constitutional law[.]" (Doc. 137 at 14.) Defendants contend that Plaintiff's invocation of a general right is insufficient to show that the officers'

conduct in this case violated clearly established law.

At the time of the officers' conduct, it was clearly established that Plaintiff had a Fourth Amendment right to be free from unreasonable seizures, although this general proposition is "of little help in determining whether the violative nature of particular conduct is clearly established." *al-Kidd*, 563 U.S. at 742 (noting that "[t]he general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment" is too general). This is nonetheless not a case in which Defendant Graham was operating against a "hazy legal backdrop." *Mullenix*, 577 U.S. at 14; *see id.* at 14-15 ("The relevant inquiry is whether existing precedent placed the conclusion that [the defendant officer] acted unreasonably in these circumstances 'beyond debate.'") (quoting *al-Kidd*, 563 U.S. at 741). At the time of the incident, Defendant Graham knew that under Vermont law he "need[ed] permission from the resident or business owner or representative to issue a [no] trespass [order]." Doc. 122-4 at 42; *see also* 13 V.S.A. § 3705(a)(1)(A) (allowing a "notice against trespass" to be given by a law enforcement officer if the officer is "acting on behalf of [the property owner] or hir or her agent"). In addition, the Supreme Court had long held that "an investigative detention must be temporary and *last no longer than is necessary to effectuate the purpose of the stop.*" *Royer*, 460 U.S. at 500 (emphasis supplied); *see also Grice v. McVeigh*, 873 F.3d 162, 167 (2d Cir. 2017) ("A *Terry* stop is limited to the degree of intrusion necessary to confirm or dispel the reasonable suspicion that justifies the stop in the first place.").

Defendants Graham and Oliver argue that even if Defendant Graham issued the No Trespass Order unilaterally, this action did not violate Plaintiff's constitutional rights because the Vermont Supreme Court has held that a no trespass notice "has no legal significance beyond acting as a necessary predicate to a criminal prosecution for trespass" and thus is "not an actionable wrong for which legal relief is available[.]" *Maarawi v. Parenteau*, 2001 WL 36140136, at *1 (Vt. Dec. 1, 2001); *see also Morse v. Sprague*, 2004 WL 5583289, at *1 (Vt. Jan. 1, 2004) ("Providing written notice to a person that the person is not permitted to enter a particular piece of property is not an actionable wrong for which damages may be sought."). The alleged constitutional

violation, however, is not Defendant Graham's issuance of the No Trespass Order; rather, it is prolonging an unconstitutional seizure in violation of the clearly established principle that a *Terry* stop must be no more intrusive and no longer than necessary to dispel or confirm a suspicion of criminal activity. If neither Ms. Quinones nor Mr. Ruff asked Defendant Graham to issue the No Trespass Order, prolonging Plaintiff's detention to do so violated clearly established law.

"Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual question must be resolved by the factfinder." *Taravella v. Town of Wolcott*, 599 F.3d 129, 135 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Kerman*, 374 F.3d at 109). Because the material facts are disputed, the court cannot determine whether it was objectively reasonable for Defendants Graham and Oliver to believe their actions did not violate Plaintiff's Fourth Amendment rights. *Kerman*, 374 F.3d at 109 ("Though immunity ordinarily should be decided by the court, . . . that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required[.]") (omission in original) (internal quotation marks omitted). As there is a "triable dispute[] as to the circumstances that could dictate whether [Defendant Graham] could reasonably believe that his . . . conduct was lawful, summary judgment based on an immunity defense must be denied." *Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 609 (S.D.N.Y. 2013) (internal quotation marks omitted).

For the reasons stated above, the court DENIES Defendant Graham's and Defendant Oliver's respective motions for summary judgment on Plaintiff's § 1983 claim on qualified immunity grounds.

### F.   Whether Defendants Graham and Oliver Are Entitled to Summary Judgment on Plaintiff's False Imprisonment Claim.

Plaintiff alleges that Defendants Graham and Oliver falsely imprisoned him when they "detained [him] without probable cause, and without any reasonable suspicion that

he had engaged in criminal activity." (Doc. 9 at 7, ¶ 34.) Defendants Graham and Oliver assert that they are entitled to qualified immunity from this claim under Vermont law. Even if they are not entitled to qualified immunity, Defendant Oliver also asserts that he and Defendant Graham are entitled to judgment on Plaintiff's false imprisonment claim as a matter of law.

To be protected by qualified immunity under Vermont law, an official must be "1) acting during the course of their employment and within the scope of their authority; 2) acting in good faith; and 3) performing discretionary, as opposed to ministerial[,] acts." *O'Connor*, 2012 VT 27, ¶ 6, 191 Vt. at 416-17, 48 A.3d at 586-87 (internal quotation marks and citations). Plaintiff does not dispute that Defendants Graham and Oliver were acting within the course of their employment and performing a discretionary act in investigating the call from Old Navy. The parties diverge solely on whether the "good faith" prong of the officers' qualified immunity defense is satisfied.

"Good faith" exists "[i]f the official's conduct does not violate clearly-established rights of which a reasonable person would have known[.]" *Amy's Enters. v. Sorrell*, 817 A.2d 612, 617 (Vt. 2002). "To make this determination, [Vermont courts] have adopted the objective good-faith test from § 1983 qualified-immunity case law. The outcome of the inquiry depends on the objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Sabia v. Neville*, 687 A.2d 469, 521 (Vt. 1996) (internal citations omitted). In considering state tort liability, "'clearly established law' is not limited to federal constitutional and statutory rights, but may include Vermont statutes, regulations and common law." *Id.*

"[A] lack of good faith is not established by asserting that the right to be free from the torts alleged in [a] plaintiff's complaint is clearly established." *Murray v. White*, 587 A.2d 975, 980 (Vt. 1991). "Rather, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . [In] the light of pre-existing law the unlawfulness must be apparent." *Id.* (alterations and omission in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). While "the right involved [in a qualified immunity analysis] must be specific to

42

the circumstances[,]" *Cook v. Nelson*, 712 A.2d 382, 386 (Vt. 1998), "the very action in question [need not] ha[ve] previously been held unlawful[.]" *Anderson*, 483 U.S. at 640.

Plaintiff argues that Defendant Graham acted out of malice, rather than in good faith; however, "subjective good faith" and "allegations of malice" are irrelevant to a qualified immunity analysis under Vermont law. The inquiry is whether a reasonable person in the official's position would have known his conduct violated clearly established law. *See Cook*, 712 A.2d at 384 ("[I]t is possible that an official will act out of improper motives and, nevertheless, be protected from state tort claims by official immunity. . . . [D]efendant in this case is entitled to immunity if he acted in *objective* good faith despite the jury's finding that he acted with malice to plaintiff.") (emphasis in original).

Whether Defendants Graham's and Oliver's issuance of the No Trespass Order exceeded the necessary scope of their investigatory stop of Plaintiff depends in part on whether the Order was issued in compliance with state and federal law. *See Murray*, 587 A.2d at 981 ("The fact that defendant's investigation was in compliance with statutory requirements, combined with an inability to find any clearly established law that imposed on defendant an obligation to investigate further, compels the conclusion that the extent of defendant's investigation was in good faith."); *Sabia*, 687 A.2d at 474 (holding that defendants were not protected by qualified immunity as a matter of law where "a fact-finder could conclude that defendants violated their statutory duties"). If a jury finds Old Navy requested the issuance of the No Trespass Order, it is likely that Defendants Graham and Oliver will be entitled to qualified immunity under state law. In contrast, if a jury finds that Old Navy did not request the Order or the officers knew that Old Navy requested the Order for a discriminatory reason, qualified immunity is unlikely to be available.

Vermont law allows "a law enforcement officer acting *on behalf of* [the] person [in lawful possession of land] or his or her agent" to issue a "notice against trespass[.]" 13 V.S.A. § 3705(a)(1)(A) (emphasis supplied). As of the time of the Old Navy incident, the Vermont Supreme Court's case law interpreting the no trespass statute, 13 V.S.A.

43

§ 3705, had repeatedly described the statute as requiring communication of a no trespass notice by the person in lawful possession, the person's agent, or law enforcement acting on the person's behalf.[10] The statute is not "subject to differing interpretations[.]" *Cook*, 712 A.2d at 386. *See also Pietrangelo, II v. Alvas Corp.*, 2010 WL 3323701, at *5 (D. Vt. May 19, 2010) (rejecting "void-for-vagueness" claim challenging notice against trespass provision of 13 V.S.A. § 3705(a) based on lack of issuance standards).

Under Vermont law, a store owner may request a No Trespass Order without justifying that decision. *See* 13 V.S.A. § 3705(a)(1)(A) (providing no issuance standards for no trespass order beyond sufficient forms of notice). Under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and Vermont's analogue, however, neither a local law enforcement officer nor a place of public accommodation may discriminate against a "qualified individual with a disability" "because of his [or her] disability." *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 196-97 (2d Cir. 2014) (internal quotation marks omitted).[11] The issue is therefore not

---

[10] *See, e.g.*, *State v. Gillard*, 88 A.3d 389, 393 (Vt. 2013) (affirming jury instructions stating that an element of the unlawful trespass change was "[e]ach [d]efendant had received notice against trespass by actual communication by a law enforcement officer acting on behalf of the person in lawful possession or his or her agent") (emphasis omitted); *Maarawi v. Parenteau*, 2001 WL 36140136, at *1 (Vt. Dec. 1, 2001) (noting that § 3750(a)(1) required "notice against trespass issued by actual communication by lawful possessor, possessor's agent or law enforcement officer acting on possessor's behalf").

[11] Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "public entity" includes "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government[.]" *Id.* § 12131(1)(A)-(B). As an instrumentality of the Town of Williston, the Williston Police Department and its law enforcement officers are subject to the ADA. The Vermont Public Accommodation Act provides a state law analogue to the ADA. Under that statute, "No individual with a disability shall be excluded from participation in or be denied the benefit of the services, facilities, goods, privileges, advantages, benefits, or accommodations or be subjected to discrimination by any place of public accommodation on the basis of his or her disability[.] 9 V.S.A. § 4502(c); *see also id.* § 4500(a) ("The provisions of this chapter . . . are intended to implement and to be construed so as to be consistent with the Americans with Disabilities Act[.]"); *id.* § 4500(b) ("Subsections 4502(b) and (c) of this title shall not be

only whether the Old Navy employees requested the No Trespass Order, but whether they did so with a discriminatory motive and whether Defendant Graham knew of that motive. The resolution of these issues turns on findings of fact which cannot be made on summary judgment. *See McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) ("The role of the district court on summary judgment is 'not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'") (quoting *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011)). Defendant Graham's and Defendant Oliver's request for qualified immunity on Plaintiff's false imprisonment claim must therefore be DENIED.

Regardless of whether he and Defendant Graham are entitled to qualified immunity, Defendant Oliver argues that based on the undisputed facts they are entitled to judgment as a matter of law because false imprisonment requires restraint of an individual which is both unlawful and "total." (Doc. 123 at 4) (internal quotation marks omitted).

"Under Vermont law, a person commits the crime of false imprisonment, or unlawful restraint in the second degree, 'if the person . . . knowingly restrains another person.'" *Grega v. Pettengill*, 123 F. Supp. 3d 517, 548 (D. Vt. 2015) (omission in original) (quoting 13 V.S.A. § 2406); *see also* 32 Am. Jur. 2d False Imprisonment § 7 ("The essential elements of false imprisonment are: (1) the detention or restraint of one against his or her will, and (2) the unlawfulness of the detention or restraint."). To restrain "means to restrict substantially the movement of another person without the person's consent or other lawful authority by, among other things, confining the restrained person for a substantial period." *State of Vermont v. Kuhlmann*, 2021 VT 52, ¶ 28, 215 Vt. 290, 302, 260 A.3d 1115, 1124 (internal quotation marks omitted) (quoting 13 V.S.A. § 2404(3)(C)).

> A claim for false imprisonment or arrest under § 1983 requires a plaintiff to allege that: "(1) the defendant intended to confine him, (2) the plaintiff was

---

construed to create or impose on governmental entities additional or higher standards, duties, or requirements than that imposed by Title II of the Americans with Disabilities Act.").

conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (per curiam) (internal quotation marks omitted). A false imprisonment claim under Vermont law requires essentially the same showing. *See Connary v. Field*, No. 12-276, slip op. at 3 (Vt. Feb. 14, 2013) (requiring proof the defendant "intended to confine plaintiff without plaintiff's consent, and that confinement was not otherwise privileged").

*Dasler v. Knapp*, 2021 WL 4134398, at *7 (D. Vt. Sept. 10, 2021).

Where Vermont law is undeveloped, the Vermont Supreme Court frequently looks to the Restatement (Second) of Torts for guidance. *See Sullivan v. Saint-Gobain Performance Plastics Corp.*, 431 F. Supp. 3d 448, 454 (D. Vt. 2019) (collecting cases and observing that "[t]he Vermont Supreme Court has frequently followed the Restatement (Second) of Torts"); *see also Birchwood Land Co. v. Krizan*, 2015 VT 37, ¶ 9, 198 Vt. 420, 425, 115 A.3d 1009, 1012 ("We frequently have adopted provisions of this Restatement [(Third) of Restitution & Unjust Enrichment] where our law is undeveloped."). Citing the Restatement (Second) of Torts § 36, the Vermont Supreme Court has held that for the purposes of a false imprisonment claim, "[t]he restraint placed upon the person must not only be unlawful, but must also be total." *State v. May*, 367 A.2d 672, 674 (Vt. 1976). Pursuant to the Restatement, "confinement may be by taking a person into custody under an asserted legal authority." Restatement (Second) of Torts § 41(1) (1965). "It is not necessary that the person asserting an authority *shall physically touch the other* or *take him under his physical control* or that submission to the custody be procured by threats or be induced by fear of physical compulsion." *Id.* § 41, cmt. b (emphasis supplied). If an actor, "by exerting legal authority, compels another to accompany him from place to place, he has as effectively confined the other as though he had locked him in a room." *Id.* § 36, cmt. c; *see also Bostic v. The Sporn Co., Inc.*, 2017 WL 11676869, at *5 (Vt. Super. Jan. 12, 2017) (holding alleged confinement was sufficient to plead false imprisonment claim where "[p]laintiffs allege[d] they understood that they were not free to leave" when police stopped them outside store and detained them for twenty minutes while they checked plaintiffs for weapons, questioned them, and

ran background checks).

Other courts have also recognized that conduct which does not involve physical restraint may constitute unlawful confinement for the purposes of a false imprisonment claim.[12] In *Kerman v. City of New York*, the Second Circuit explained that at common law, false imprisonment "is complete with even a brief restraint of the plaintiff's freedom[.]" 374 F.3d at 125 (internal quotation marks omitted). It has not held that this "unlawful interference with [the plaintiff's] liberty" must be physical, although in *Kerman* it was. *Id.*

Defendant Graham exercised his legal authority as a police officer to take Plaintiff's driver's license with him when he went into Old Navy to investigate while Defendant Oliver waited with Plaintiff. Defendant Oliver expressly stated that he waited with Plaintiff to "[m]ak[e] sure he didn't leave" and that, had Plaintiff tried to walk away, he would have "[t]old him to not leave and he needs to stay with me; he's being detained." (Doc. 137-31 at 8-9.) Notwithstanding the lack of physical force or touching used to detain Plaintiff, Defendants Oliver and Graham fail to establish that Plaintiff was not confined by their exercise of legal authority and to establish that, as a matter of law, their restraint of him was not total. Because an issue of fact exists as to whether Plaintiff's confinement was lawful and the extent of that confinement, Defendants Graham's and Oliver's motions for summary judgment on Plaintiff's false imprisonment claim are DENIED.

### G.   Whether Old Navy is Entitled to Summary Judgment on Plaintiff's State Law False Imprisonment Claim.

Plaintiff brings a state law false imprisonment claim against Old Navy, alleging that "Defendant Old Navy, through its employees and agents, caused Mr. Brush to be

---

[12] *See, e.g.*, *Vasquez v. Pampena*, 2009 WL 1373591, at *2 (E.D.N.Y. May 18, 2009) (finding confinement sufficient for false imprisonment purposes where defendant "'ordered' [plaintiff] to show his ID, ordered him to 'stay put' while he issued a summons, and 'held on to' [plaintiff's] ID while he wrote the summons"); *Berry v. Loiseau*, 614 A.2d 414, 432 (Conn. 1992) ("[T]he trial court properly defined false imprisonment as the intentional, unlawful restraint or confinement of a person's physical liberty through the exercise of force . . . *express or implied*.") (omission in original) (internal quotation marks omitted) (emphasis supplied).

detained by Defendants Graham and Oliver, without any justifiable basis for doing so." (Doc. 9 at 7, ¶ 34.) He asserts: "It was within Old Navy's power to call off the cops, but they didn't. Instead, for twenty minutes, they let [Plaintiff] stand outside in the cold, fully aware that he was being detained for a crime that had not been committed." (Doc. 143 at 9.)

With the exception of a decision in 1904, the Vermont Supreme Court appears not to have addressed the issue of liability for individuals aiding and abetting false imprisonment. In that case, the court cited the rule that "[a] person who causes, instigates, and procures an unlawful imprisonment is liable in damages therefor." *Goodell v. Tower*, 58 A. 790, 792 (Vt. 1904). Vermont law does, however, recognize a claim for aiding and abetting in the commission of a tort. *See Montgomery v. Devoid*, 2006 VT 127, ¶ 22, 181 Vt. 154, 164, 915 A.2d 270, 278 ("[W]e have held that '[a]ll who aid in the commission of a tort by another, or who approve of it after it is done, *if done for their benefit,* are liable in the same manner as they would be if they had done it with their own hands.'") (emphasis and second alteration in original) (quoting *Dansro v. Scribner,* 187 A. 803, 804 (Vt. 1936)).

The Restatement (Second) of Torts provides that "[o]ne who instigates a confinement may be subject to liability to the person confined for false imprisonment." Restatement (Second) of Torts § 45A (1965). It further explains:

> Instigation consists of words or acts which direct, request, invite or encourage the false imprisonment itself. In the case of an arrest, it is the equivalent, in words or conduct, of "Officer, arrest that man!" It is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them.

*Id.* § 45 A, cmt. c. "In order for this Section to be applicable to an arrest, it must be a false arrest, made without legal authority." *Id.* cmt. b.

A Vermont Superior Court has ruled:

> [G]enerally, "a defendant who furnishes information to police will not generally be held liable for false arrest when the police exercise

48

independent judgment to arrest a plaintiff." However, an exception to that
rule exists where a defendant "instigates" an arrest by taking "an active role
in the arrest of the plaintiff, such as giving advice and encouragement or
importuning the authorities to act," with the intent to confine the plaintiff.
"The defendant must have affirmatively induced the officer to act, such as
taking an active part in the arrest and procuring it to be made or showing
active, officious and undue zeal, to the point where the officer is not acting
of his own volition[.]"

*Bostic*, 2017 WL 11676869, at *5 (internal citations omitted).

Defendants Graham and Oliver lawfully initiated a *Terry* stop, and their conduct

initially did not exceed the appropriate scope of that stop. During this initial time period,

they did not "restrict substantially [Plaintiff's] movement . . . without . . . lawful

authority[,]" 13 V.S.A. § 2404(3), and therefore did not falsely imprison Plaintiff.

Whether Plaintiff was falsely imprisoned thereafter turns on who requested the No

Trespass Order and whether it was lawful.

A material dispute of fact exists regarding whether the Old Navy employees

affirmatively requested that Defendant Graham issue Plaintiff the No Trespass Order. If

the Old Navy employees did not "tak[e] an active role" in Plaintiff's allegedly unlawful

detention, Old Navy has no liability for false imprisonment under Vermont law. *Bostic*,

2017 WL 11676869, at *5 (internal quotation marks omitted). This is because "[t]o hold a

defendant liable as one who affirmatively instigated or procured an arrest, a plaintiff must

show that the defendant or its employees did more than merely provide information to the

police." *King v. Crossland Sav. Bank*, 111 F.3d 251, 257 (2d Cir. 1997) (upholding

summary judgment for defendant bank on false imprisonment claim where bank

erroneously reported checks deposited by plaintiffs as being lost or stolen to police and

police arrested plaintiffs).

Because there are genuine issues of material fact, Old Navy's motion for summary

judgment on Plaintiff's false imprisonment claim must be DENIED.

### H.      Whether the Town Is Entitled to Summary Judgment on Plaintiff's § 1983 Failure to Train or Supervise Claim.

Plaintiff alleges that the Town is liable under 42 U.S.C. § 1983 for failing to

properly train and supervise Defendants Graham and Oliver. The Town asserts that it is

entitled to summary judgment on this claim because no underlying constitutional violation occurred and because even if Plaintiff's rights were violated, Plaintiff cannot show a causal connection between the alleged violation and its alleged failure to train and supervise.

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality may be liable under 42 U.S.C. § 1983 for its employees' unconstitutional acts "if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012). To assert a *Monell* claim, a plaintiff must prove: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (citing *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) (internal quotation marks omitted)). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

In some circumstances, a municipality's failure to train or supervise local government employees may "rise to the level of an official government policy" for § 1983 purposes. *Id.* A municipality's "failure to train or supervise city employees may constitute an official policy or custom [only] if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray*, 490 F.3d at 195-96 (citing *City of Canton v. Harris,* 489 U.S. 378, 388 (1989)). "To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights." *Jones*, 691 F.3d at 81.

> A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of

> their action—the 'deliberate indifference'—necessary to trigger municipal liability." Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Connick*, 563 U.S. at 62 (internal citations omitted) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). For the purposes of a failure to supervise claim, the "plaintiff['s] evidence must establish only that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious, and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 128 (2d Cir. 2004) (internal citation omitted).

"Moreover, where . . . a city has a training program, a plaintiff must—in addition—identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Wray*, 490 F.3d at 196 (internal quotation marks omitted). Where a plaintiff alleges a failure of supervision, he or she "must prove in the end that the state defendants' inadequate supervision actually caused or was the moving force behind the alleged violations." *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007).

Although Plaintiff cites alleged deficiencies in the Williston Police Department, none of these deficiencies appear to have a causal relationship to Plaintiff's detention. Plaintiff's allegations of "years of continuous staffing shortages" (Doc. 138 at 14) are supported only by Chief Foley's testimony that his department is "shorthanded" but with nine more officers "[he] can make it work" (Doc. 137-32 at 6), and that he plans to add more officers to the "internal affairs unit" he created. *Id.* at 8. Chronic understaffing without facts connecting that status to the alleged Fourth Amendment violation does not establish that better training or supervision would have prevented the alleged violation.[13]

---

[13] Plaintiff contends that there was no investigation of his encounter with Defendants Graham and Oliver. To the extent that Plaintiff asserts failure to investigate as an alternative basis for his *Monell* claim, a single instance of inadequate investigation is insufficient to show the Town's

51

Plaintiff cites Defendant Graham's testimony and internal Williston Police Department reports discussing complaints of employee misconduct, including Defendant Graham's improper use of a criminal background check database in 2011, to argue that there is a "long history of internal conflict" and misconduct or poor management by its police chiefs prior to 2017. (Doc. 138 at 15.) He points to the continued supervisory position of thirty-year veteran officer Sergeant Bart Chamberlain, who was removed from his position as Acting Chief in 2010 following complaints that he had conducted an affair with a co-worker and used his role "to harass employees and create a hostile and uncomfortable work environment that was affecting morale and the entire effectiveness of the department." (Doc. 137-9 at 4.) He also cites evidence from the Troidl Report that employees and officers had differing views of the leadership of former Chief Shepard, including that oversight was lax during his tenure as Chief.

Where a plaintiff "challenge[s] a many-layered supervisory program spanning several years—rather than an isolated incident of non-supervision—[he or she] [is] required to identify with specificity the inadequacies giving rise to [his or her] claim." *Reynolds*, 506 F.3d at 193. Despite identifying various reports of misconduct or poor management within the Department, Plaintiff fails to identify a particular supervisory deficiency leading to his alleged constitutional deprivation in November 2019. As the events identified by Plaintiff do not relate to investigatory detentions or unlawful seizures, it is not apparent how they would have put policymakers on notice of possible Fourth Amendment violations. In addition, these events occurred prior to Chief Foley's appointment as Police Chief and Defendant Oliver's employment as a Williston police officer.

---

deliberate indifference. Although "a failure to investigate is not cognizable as a freestanding claim under § 1983, it may still be considered as part of a *Monell* claim." *Curkin v. City of New York*, 2020 WL 5628042, at *11 (S.D.N.Y. Sept. 21, 2020) (internal citation omitted). In the context of excessive force claims, the Second Circuit has stated that "a municipal policy of deliberate indifference to the use of excessive force by police officers may be shown by evidence that the municipality had notice of complaints of the use of such force but repeatedly failed to make any meaningful investigation into such charges." *Outlaw v. City of Hartford*, 884 F.3d 351, 380 (2d Cir. 2018).

The departure of Officer Travis Trybulski from the Department in 2021 for failure to comply with the Department's Fair and Impartial Policing Policy and the 2020 resignations of Defendants Graham and Oliver after allegations of workplace or criminal misconduct also do not support a causal connection. Although these instances allegedly involved biased, discriminatory, or dishonest conduct by those officers, they occurred after the incident at Old Navy and do not establish specific supervisory inadequacies that "actually caused" or were "the moving force" behind the alleged Fourth Amendment violation. *Id.* at 193. Town policymakers could not have "had notice of a potentially serious problem of unconstitutional conduct" prior to the Old Navy incident on the basis of conduct that occurred thereafter. *Amnesty Am.*, 361 F.3d at 128.

Plaintiff's criticisms of the Fair and Impartial Policing training completed by Defendants Graham and Oliver likewise lack a causal connection and do not support his *Monell* claim. Although evidence that Defendants Graham and Oliver received no training on investigative stops or issuing no trespass orders from the Town may be relevant to his Fourth Amendment claim,[14] Defendants Graham and Oliver received VCJTC training in federal and state criminal law in order to become certified as police officers. The Town required its officers to be familiar with all of its internal policies and

---

[14] Chief Foley testified in deposition:

> Q. Does the Town of Williston provide its officers with any training in conducting investigative detentions?

> A. They're trained at the Academy, depending on what type of classes they're taking at the Academy during their academics. And then we try to, you know, do – you know, on case by case; if we have an issue, we try to go back and try to, you know, talk it up and try to make sure that they're following the proper policies.

> Q. Okay. But does the department offer any trainings itself in that area?

> A. No. Individual supervisors could, you know, take out one of the general orders and sit down with them and go over, if we start seeing issues with, you know, somebody's misinterpreting the policy. But we don't have a, per se, training for that type of policy.

(Doc. 137-32 at 16.)

procedures,[15] and its Field Interviews and Pat-Down Searches General Order provided guidelines for conducting investigatory detentions supported by reasonable suspicion and lasting no "longer than is reasonably necessary to make these limited inquiries." (Doc. 122-2 at 7) (emphasis omitted).

While Plaintiff argues that the responses of Defendants Graham and Oliver to questions regarding the applicable standards for investigatory stops were inaccurate or incomplete, he does not identify specific deficiencies with the VCJTC training that Defendants Graham and Oliver received or explain why the Department should not have relied on the VCJTC training. Nor does Plaintiff prove that the Town was on notice of specific deficiencies in the Department's training on investigatory detentions or no trespass orders. "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 563 U.S. at 61. Absent proof of "particular omission[s]" and "actual or constructive notice" of those omissions, Plaintiff cannot maintain a *Monell* claim against the Town on a failure to train or supervise basis. *Id.*

Finally, Plaintiff points to the 2008 suit brought by Ms. Bennett-Jones against Defendant Graham alleging claims of assault, battery, excessive force, improper seizure, and false arrest. He notes the lack of consequences for Defendant Graham as a result of the lawsuit. It is well established that "in general a plaintiff cannot establish municipal liability solely by inference from evidence of the occurrence of the incident in question[.]" *Elnicki v. City of Rutland*, 2019 WL 131858, at *8 (D. Vt. Jan. 8, 2019) (internal quotation marks and citations omitted). "[R]ather[,] Plaintiff must proffer admissible evidence of other incidents that placed the [Town] on notice." *Id.* "When there is only one instance of the particular constitutional violation alleged by a plaintiff, it will ordinarily be insufficient to state a failure to supervise claim." *Walker v. City of New*

---

[15] *See* Doc. 137-30 at 17 ("Q. . . . As a Williston police officer weren't you required to be familiar with all of the policies and procedures that applied to your, to Williston Police Department? A. Yes.").

*York*, 63 F. Supp. 3d 301, 311 (E.D.N.Y. 2014).[16] A single dated and dissimilar prior incident does not provide adequate notice. *See Colon v. City of Rochester*, 419 F. Supp. 3d 586, 605 (W.D.N.Y. 2019) (observing that in assessing whether past incidents demonstrate deliberate indifference "courts typically consider both the number of alleged prior incidents and the degree of similarity that they bear to the incident that gave rise to the lawsuit at bar"); *Pluma v. City of New York*, 2015 WL 1623828, at *12 (S.D.N.Y. Mar. 31, 2015) ("[T]his handful of dissimilar incidents occurring over the course of more than a decade is too sparse to put the City on notice that the NYPD's training program produces officers who are likely to commit constitutional violations through their deployment of pepper spray."). Instead, Plaintiff must "prove a pattern of similar violations that would 'establish that the policy of inaction [was] the functional equivalent of a decision by the [Town] itself to violate the Constitution.'" *Connick*, 563 U.S. at 72 (quoting *Canton,* 489 U.S. at 395) (first alteration in original).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* at 61. Plaintiff does not proffer any evidence that Town officials exhibited deliberate indifference by "conscious[ly] disregard[ing] . . . the risk that poorly-trained [or poorly supervised] employees will cause deprivations of clearly established constitutional rights." *Wray*, 490 F.3d at 196. He thus has failed to identify a genuine issue of material fact with regard to his failure to train and supervise claims. The Town's motion for summary judgment on Plaintiff's § 1983 claim against it is therefore GRANTED.

---

[16] Similarly, Plaintiff points to Ms. Quinones's testimony that Defendant Graham told the Old Navy employees that Plaintiff "had priors for a drug offense" (Doc. 137-36 at 9) and Chief Foley's testimony that Defendant Graham was "not allowed" to share Plaintiff's criminal history with the Old Navy employees. (Doc. 137-32 at 17). Referencing the 2011 investigation into Defendant Graham's background check on a co-worker's son, Plaintiff argues: "This is not the first time Defendant Graham has been accused of making inappropriate use of criminal background checks." (Doc. 138 at 9 n.3.) The constitutional violation in this case is not based on the information Defendant Graham shared with the Old Navy employees.

I.     **Whether Old Navy is Entitled to Summary Judgment on Plaintiff's Disability Discrimination Claim Under 9 V.S.A. § 4501.**

Plaintiff alleges that Old Navy discriminated against him in violation of Vermont's Public Accommodation Act ("VPAA"), 9 V.S.A. § 4501, by (1) "caus[ing] the police to detain [him] without any reasonable basis to believe that he had engaged in activity that would warrant doing so[,]" and (2) "caus[ing] the police to serve [Plaintiff] with a [N]o [T]respass [O]rder, barring him from returning to the store." (Doc. 9 at 6, ¶¶ 30-31.) He claims that "Defendant's [Old Navy's] employees acted with discriminatory intent based solely on [Plaintiff]'s open and apparent disability, thereby denying him the benefit of Defendant's [Old Navy's] goods and services[.]" *Id.* ¶ 31.

The VPAA provides:

No individual with a disability shall be excluded from participation in or be denied the benefit of the services, facilities, goods, privileges, advantages, benefits, or accommodations or be subjected to discrimination by any place of public accommodation on the basis of his or her disability as follows:

(1) A public accommodation shall provide an individual with a disability the opportunity to participate in its services, facilities, privileges, advantages, benefits, and accommodations.

9 V.S.A. § 4502(c)(1). The VPAA's provisions "are intended to implement and to be construed so as to be consistent with the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. and regulations promulgated under that Act, and are not intended to impose additional or higher standards, duties, or requirements than that Act." *Id.* § 4500(a).

Under the ADA, "[a] plaintiff alleging disability discrimination 'can base [a] claim on any of three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation.'" *Brooklyn Ctr. for Psychotherapy, Inc. v. Phila. Indem. Ins. Co.*, 955 F.3d 305, 311 (2d Cir. 2020) (quoting *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009)). To state a prima facie claim for disability discrimination, Plaintiff must show: "(1) that [he] is disabled within the meaning of the [VPAA]; (2) that [Old Navy] own[s], lease[s], or operate[s] a place of public accommodation; and (3) that [Old Navy] discriminated against [him] by denying [him] a full and equal opportunity to enjoy the services [Old Navy] provide[s]."

*Camarillo v. Carrols Corp.,* 518 F.3d 153, 156 (2d Cir. 2008).

"Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, [] (1973)." *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009). Under the *McDonnell Douglas* framework, the burden is first on the plaintiff to "establish a prima facie case[.]" *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). The burden then shifts to the "employer [to] offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [decision,]" before shifting to the plaintiff at the third and final step to "then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Id.* "[A] reason cannot be proved to be a pretext for *discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original) (internal quotation marks omitted).

The parties do not dispute that Old Navy is subject to the VPAA or that the Plaintiff is disabled within the meaning of the VPAA. Old Navy nonetheless argues that Plaintiff cannot establish a prima facie case of discrimination thereunder because Plaintiff cannot show that Old Navy has denied him access to its goods or services.

Actual exclusion or denial of goods or services may be the basis for a disability discrimination claim brought under the VPAA. *See* § 4502(c) (prohibiting places of public accommodation from "exclud[ing]" or "den[ying] the benefit of [their] services, facilities, goods, privileges, advantages, benefits, or accommodations" to an individual with a disability "on the basis of his or her disability"); *see also Hum. Rts. Comm'n v. Benevolent & Protective Ord. of Elks of U.S.*, 2003 VT 104, ¶ 14, 176 Vt. 125, 131, 839 A.2d 576, 582 ("One such evil that public accommodations statutes, such as the [VPAA], seek to suppress is the 'deprivation of personal dignity that surely accompanies denials of equal access to public establishments.'") (quoting *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 250 (1964); *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 97 (2d Cir. 2012) ("[C]areful attention to the requirements of the statute reveals that Title III [of the

ADA] is designed to prevent a facility offering public accommodation from denying individuals with disabilities goods and services[.]") (alteration adopted) (internal citation and quotation marks omitted). Old Navy asserts that a no trespass order does not prevent an individual from entering the relevant property with the consent of the person in possession of the property and asserts it would have allowed Plaintiff access to its goods and services had Plaintiff asked. It cites no evidence beyond its self-serving representations to support this claim.

Although Plaintiff "points to no caselaw standing for the proposition that the chilling effect of a bad experience is in itself sufficient to constitute a denial or refusal of the privileges or benefits of a public accommodation[,]" *Garrett v. Tandy Corp.*, 2003 WL 21250679, at *10 (D. Me. May 30, 2003), *report and recommendation adopted*, 2003 WL 21703637 (D. Me. July 22, 2003), *aff'd*, 86 F. App'x 440 (1st Cir. 2004), it is undisputed that Defendant Graham issued Plaintiff a legal order advising him that it was *illegal* for him to "enter[] or remain[] . . . in any place as to which notice against trespass is given[.]" 13 V.S.A. § 3705(a)(1). The No Trespass Order stated: "This becomes effective immediately, if you are found on this property again, you will be charged with trespassing." (Doc. 143-14.) In addition, Plaintiff testified that Defendant Graham told him he could be arrested if he tried to enter Old Navy while the Order was in place. Against this backdrop, Old Navy is incorrect as a matter of law that Plaintiff was free to disregard the No Trespass Order and that Plaintiff had an affirmative obligation to seek Old Navy's consent to enter its store.

Although it is undisputed that Plaintiff has not returned to Old Navy since November 28, 2019, the date of the incident, and that he testified that he will "[n]ever" consider returning to Old Navy again, notwithstanding the rescission of the No Trespass Order (Doc. 126-6 at 65), there is every reason to believe that, but for the incident, he would have continued to shop at Old Navy.[17] Old Navy points to no authority that a

---

[17] To the extent there are concerns regarding ripeness or whether Plaintiff has experienced a cognizable injury, in *Huminski v. Corsones*, 396 F.3d 53 (2d Cir. 2005), the Second Circuit addressed those concerns:

plaintiff must expose himself or herself to possible arrest to establish an actual denial or exclusion of goods or services at the prima facie stage.

Old Navy's cited authority instead involves disabled plaintiffs who were not denied access to goods or services enjoyed by non-disabled customers. *See Bentley v. JDM Enters.*, 2020 WL 5250490, at *5 (W.D.N.Y. Sept. 3, 2020) (finding "[p]laintiff cannot establish that he was denied a full and equal opportunity to enjoy the services provided by [d]efendant" where he "concede[d] that he was never denied service, asked to leave the restaurant, prevented from parking in an accessible space, or asked to move his vehicle"); *Gonzales v. H.E. Butt Grocery Co.*, 226 F. App'x 342, 344-45 (5th Cir. 2007) ("It is undisputed that [plaintiff] would have been able to purchase cigarettes at [defendant's store] if he had enough money with him when he entered the store; [defendant] never denied him access to its goods."); *Anderson v. Kohl's Corp.*, 2013 WL

---

We think that Huminski's claims are ripe for our review despite the argument made by some of the defendants (1) that Huminski has not suffered any demonstrable injury from the trespass notices because no criminal action has been commenced against him based on them and (2) that he has he not yet been denied access to courthouse grounds on the basis of the notices. "[I]n the First Amendment context, the ripeness doctrine is somewhat relaxed." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 90 (2d Cir.2002). As contrasted with a typical fear of enforcement of a general law or regulation, the issuance of personalized trespass notices to Huminski gives rise to a non-speculative alleged injury. *Cf. Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) ("We do not doubt that hostile action toward a litigant could be so offensive as to effectively drive the litigant out of a courthouse and thereby become the functional equivalent of a denial of access."), *cert. denied,* 525 U.S. 823 . . . (1998).

396 F.3d at 80, n.27. Although Plaintiff does not raise First Amendment concerns, there is ample evidence that, but for the incident, he would have continued to shop at Old Navy. *See also Camarillo v. Carrols Corp.*, 518 F.3d 153, 158 (2d Cir. 2008) (holding plaintiff had standing where "(1) she has alleged past injury under the ADA . . . ; (2) it is reasonable to infer from her complaint that this discriminatory treatment will continue; and (3) it is also reasonable to infer, based on the past frequency of her visits and the proximity of defendants' restaurants to her home, that [plaintiff] intends to return to these restaurants in the future"); *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 188 (2d Cir. 2013) ("To the extent *Camarillo* left unresolved the question of whether deterrence constitutes an injury under the ADA, we now adopt the Ninth Circuit's ruling in *Pickern* and hold that it does.").

1874812, at *10 (W.D. Pa. May 3, 2013) (dismissing ADA claim where plaintiff failed to plead "she was denied access to any goods or services that the [d]efendant provides to non-disabled customers anywhere in its stores"); *Cornilles v. Regal Cinemas, Inc.*, 2002 WL 31440885, at *2 (D. Or. Jan. 3, 2002) ("Plaintiffs make no claim that they have not been afforded access to any theater or the opportunity to view any movie being shown at the theaters.").

By barring Plaintiff from its store indefinitely, Old Navy denied him equal access to its goods or services. *See* § 4502(c)(1) ("A public accommodation shall provide an individual with a disability the opportunity to participate in its services, facilities, privileges, advantages, benefits, and accommodations. It is discriminatory to offer an individual an unequal opportunity or separate benefit[.]"); *see also Huminski v. Corsones*, 396 F.3d 53, 87 (2d Cir. 2005) ("The Notices Against Trespass bar Huminski from the state courthouses of Rutland and their grounds indefinitely and virtually completely.").

Although Old Navy argues that if there was a denial of services, it was not "on account of" Plaintiff's disability, *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 87 (2d Cir. 2004), on summary judgment the court must examine the evidence in the light most favorable to the non-moving party. Here, Plaintiff has proffered evidence that the Old Navy employees were told he had Tourette's and sought a No Trespass Order against him anyway, even though there was no evidence he had shoplifted from the store.

The Supreme Court has observed that if an employer "were truly unaware that such a disability existed, it would be impossible for her . . . decision to have been based, even in part, on respondent's disability. And, if no part of the . . . decision turned on respondent's status as disabled, he cannot, *ipso facto,* have been subject to disparate treatment." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.7 (2003). The Second Circuit has likewise held that "a defendant's discriminatory intent cannot be inferred, even at the *prima facie* stage, from circumstances unknown to the defendant." *Woodman*, 411 F.3d at 82; *see also id.* at 82-83 (holding that in an age discrimination case, "where a plaintiff relies on a substantial age discrepancy between herself and her replacement, she must adduce some evidence indicating defendants' knowledge as to that discrepancy to support

60

the inference of discriminatory intent required by the fourth *prima facie* factor").

While Defendant Graham claimed that Plaintiff's disability was not discussed during the conversation regarding the No Trespass Order, the Order was issued within an hour of the employees complaining about Plaintiff's Tourette's-related behavior. *See Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) (observing that in the context of employment discrimination claims, "[i]n this Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse . . . action") (internal quotation marks omitted). Defendant Graham's conversation with the dispatcher who checked Plaintiff's criminal history reflected that he was aware his conduct might be perceived as discriminatory. Finally, pursuant to its own policies, Old Navy's employees were not authorized to call the police for loss prevention purposes but they did so. *See Lizardo v. Denny's, Inc.*, 270 F.3d 94, 103 (2d Cir. 2001) (finding "weak" prima facie case of racial discrimination where the record contained "some evidence from which a jury could conclude that the defendants in times past may have been more tolerant of similarly bad behavior by white patrons"). Construing the evidence in the light most favorable to Plaintiff, he has established a prima facie case of disability discrimination under the VPAA.

Once a plaintiff has established a prima facie case of discrimination, a defendant must proffer a legitimate, non-discriminatory reason for its conduct. Old Navy contends that its employees called the police because of "red flag" behaviors by Plaintiff which they interpreted as raising safety concerns, not as signs of disability, and that Defendant Graham issued the No Trespass Order due to the alleged association between Plaintiff's history of a drug offense and a heightened likelihood of retail theft. Old Navy has therefore carried its burden of establishing a legitimate, non-discriminatory reason for its employees' actions, shifting the burden to Plaintiff to proffer admissible evidence that its proffered reasons are pretextual.

To establish pretext, a plaintiff must rebut "the proffered reason with facts from which a factfinder could reasonably conclude that the proffered reasons are unworthy of

credence." *Gauthier v. Keurig Green Mountain, Inc.*, 2015 VT 108, ¶ 33, 200 Vt. 125, 144, 129 A.3d 108, 122. "[A]lthough the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual[.]" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (omission in original) (internal citations and quotation marks omitted). "Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013) (footnote omitted).

Although Defendant Graham claimed that Plaintiff's "personal characteristics" were not mentioned during the discussion regarding whether to issue the No Trespass Order (Doc. 126-12 at 103), he concedes he told the Old Navy employees and police dispatch that Plaintiff had Tourette's. Courts have found a party's state of mind or intent to be questions of fact inappropriate for resolution at the summary judgment stage.[18]

Plaintiff further argues that Old Navy employees' failure to inform the police of any safety concerns demonstrates that their claim to the contrary was pretextual. At trial,

> The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct." In other words, "[i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."

*James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000) (quoting *Reeves*, 530

---

[18] *See United States v. Rajaratnam*, 719 F.3d 139, 153 (2d Cir. 2013) ("Whether an individual had a particular mental state 'is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence,' but courts must not 'confus[e] a mental state with the proof of its existence[.]'") (quoting *Farmer v. Brennan*, 511 U.S 825, 842 (1994) (first alteration in original)); *Redd v. New York Div. of Parole*, 678 F.3d 166, 178 (2d Cir. 2012) ("Although summary judgment in discrimination cases is fully appropriate, indeed mandated, when the evidence is insufficient to support the non-moving party's case, when, as is often the case in sexual harassment claims, fact questions such as state of mind or intent are at issue, summary judgment should be used sparingly[.]") (internal quotation marks and citations omitted).

U.S. at 146-47) (alterations in original).

Construing the record in the light most favorable to Plaintiff, he has identified a genuine dispute of material fact regarding whether Old Navy's non-discriminatory reasons for its employees' conduct were pretextual. Old Navy's motion for summary judgment on Plaintiff's VPAA claim is therefore DENIED.

### J.   Whether Old Navy is Entitled to Summary Judgment on Plaintiff's Claim for Punitive Damages.

Old Navy contends that it is entitled to summary judgment in its favor on Plaintiff's claim for punitive damages. "In Vermont, punitive damages are reserved for especially egregious conduct, and thus the party seeking them must overcome a very high standard of proof." *Beaudoin on Behalf of New England Expedition Ltd. P'ship II v. Feldman*, 2018 VT 83, ¶ 18, 208 Vt. 169, 178, 196 A.3d 768, 776 (internal quotation marks and alteration omitted). "An award of punitive damages requires a showing of two essential elements – wrongful conduct that is outrageously reprehensible and malice, defined variously as bad motive, ill will, personal spite or hatred, reckless disregard, and the like." *Id.* (internal quotation marks omitted). "[S]uch conduct need not only be wrongful, but truly reprehensible" and "the defendant must have acted with malice, [which requires] some showing of bad motive." *Fly Fish Vermont, Inc. v. Chapin Hill Ests., Inc.*, 2010 VT 33, ¶ 19, 187 Vt. 541, 549, 996 A.2d 1167, 1174 (internal quotation marks omitted). An individual subject to a VPAA violation may bring a civil action seeking punitive damages. 9 V.S.A. § 4506(a).

Vermont law requires additional evidence if punitive damages are sought against a corporation:

> The fact that the defendant is a corporation does not prevent an award of punitive damages in an appropriate case, but the malicious or unlawful act relied upon must be that of the governing officers of the corporation or one lawfully exercising their authority, or, if the act relied upon is that of a servant or agent of the corporation, it must be clearly shown that the governing officers either directed the act, participated in it, or subsequently ratified it.

*Shortle v. Cent. Vt. Pub. Serv. Corp*, 399 A.2d 517, 518 (Vt. 1979).

Under Vermont law, the trial court must decide in the first instance whether punitive damages are warranted. *See Folio v. Florindo*, 2009 VT 11, ¶ 44, 185 Vt. 390, 411, 970 A.3d 1230, 1245 (observing that "[w]e require a showing that defendants acted with actual malice before we allow the issue of punitive damages to go to a jury"); *see also Goldberg v. Dufour*, 2020 WL 620899, at *24 (D. Vt. Feb. 10, 2020) (holding that "[a] claim for exemplary damages may nonetheless be the subject of a Rule 12(b)(6) motion for failure to state a claim on the grounds that this type of damages is not available as a matter of law or because the grounds for such damages have not been plausibly pled").

"To demonstrate the malice necessary to establish liability for punitive damages, one must show 'conduct manifesting personal ill will or carried out under circumstances evidencing insult or oppression, or even by conduct showing a reckless or wanton disregard of one's rights.'" *DeYoung v. Ruggiero*, 2009 VT 9, ¶ 24, 185 Vt. 267, 278, 971 A.2d 627, 635 (quoting *Brueckner v. Norwich Univ.*, 730 A.2d 1086, 1095 (Vt. 1999)).

In this case, Plaintiff argues the VPAA and Vermont case law establish that intent to discriminate is a sufficient basis for a punitive damages award. He further contends that Old Navy's employees acted with discriminatory intent. He cites at best *some* evidence that corporate officers "subsequently ratified" the alleged discriminatory conduct by leaving the No Trespass Order in place for almost two years after Old Navy claimed it was issued without its consent, after Plaintiff had brought claims in the Vermont Human Rights Commission and after Plaintiff had filed suit. *Shortle*, 399 A.2d at 518.

Although a close question, Old Navy has not established it is entitled to summary judgment on Plaintiff's punitive damages claim as a matter of law. Its motion for summary judgment on Plaintiff's punitive damages claim is therefore DENIED WITHOUT PREJUDICE to renew at trial.

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART Old Navy's motion to exclude Plaintiff's expert Dr. Thomas Powell. The court DENIES Scott Graham's and Timothy Oliver's motions for summary judgment. (Docs. 122, 123.) The court GRANTS the Town of Williston's motion for summary judgment on Plaintiff's § 1983 claim against it (Doc. 124) and DENIES Old Navy's motion for summary judgment. (Doc. 126.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 17th day of August, 2023.

Christina Reiss, District Judge
United States District Court